PER CURIAM.

(No. 6777–

ORR CONSTRUCTION COMPANY, Claimant, *vs.* STATE OF
ILLINOIS, DEPARTMENT OF PUBLIC WORKS AND BUILDINGS,
Respondent.

*Opinion filed February 3, 1975.*

HARRY M. BROSTOFF, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; SAUL R.
WEXLER and MARTIN A. SOLL, Assistant Attorneys General, for Respondent.

HOLDERMAN, J.

This claim is founded upon a contract entered into by
the respondent with the claimant, a general contractor,
for the construction of a particular section of Illinois
Route 57 Highway in Fayette County.[1]

The facts are not in dispute. The issues, under which
claimant's five-count complaint seeks damages in the

___

[1] The contract is described by the Department of Public Works and Buildings as FAI Route No. 57, Project 1-57-3 (73) 134, Section 26 (1A, 1B-1, 2A, 2B-1 Fayette County. Job No. 97-133-68.

sum of $572,408.12, arise out of a dispute in the interpretation of "Special Provisions" in the contract entitled, "Removal and Replacement of Silty Topsoil Materials".

This court is called upon to resolve the legal issues by making a judicial interpretation of the contract provision in dispute. Hence, without any objections from the respondent, we granted claimant's motion to render a declaratory judgment in this cause pursuant to *§57.1 of the Civil Practice Act.* The parties concede that a declaration of their respective rights under the disputed provision of the contract which they request this court to construe may obviate the necessity for further litigation on the question of damages.

Both parties have informed the court that, if the legal question is decided in favor of the claimant, there is a possibility that the parties hereto in conference may reach a settlement on the amount of claimant's damages making it unnecessary to go to trial on that factual issue. Conversely, if the ruling is favorable to the respondent, there would be no need for further proceedings in this cause.

As essential prologue to our interpretation of the disputed section of the contract, we restate the undisputed pertinent facts. On January 24, 1969, the claimant submitted its sealed proposal for contract with the respondent under which claimant would construct the following: certain mainline grading and drainage for future pavement and ramps, as well as frontage roads, drainage structures, fencing, seeding, clearing and other work; a triple-barrel box culvert; and two steel bridges. This contract, as bid upon, was prepared and drafted solely by respondent. It consists of: (a) *Plans,* (b) *Standard Speci-*

*fications for Road and Bridge Construction* and (c) *Special Provisions* (which supplement the *Standard Specifications.)*

The *Special Provisions* (on page 3 of the contract) provide, in relevant part:

> *REMOVAL AND REPLACEMENT OF SILTY TOPSOIL MATERIAL:*
> Within the following station limits, and, as shown on the cross sections, the silty topsoil horizon is to be removed and replaced with suitable material.
>
> This silty material shall be removed to a depth sufficient to provide a minimum thickness of 24 inches of suitable material between the bottom of the subbase and the remaining soil. The minimum depth of excavation shall be six (6) inches. The width of excavation shall extend beneath the pavement and the stabilized portions of the shoulders. The excavated material *may* be used in embankments greater than two feet in height and placed in alternate layers with suitable material. The height of embankment is to be measured from original ground to bottom of subbase. (Emphasis supplied to the keyword "may".)
>
> The silty material as well as material excavated from ditches or other excavations which has an A-4 classification (HRB classifications) and a silt content greater than 50% shall not be placed in embankments less than two (2) feet in height.
>
> It is hereby understood and agreed that the final determination as to the materials to be removed and replaced will be made by the Engineer in the field and the plan quantity for Earth Excavation adjusted accordingly.
>
> [Here the contract contains a table listing 21 areas in both the northbound and southbound pavement, from station number to station numbers, in which the silty topsoil material was to be removed and replaced.]

*Standard Specifications* Section 202.03 (p. 31) in relevant part provides as follows:

> "Unless otherwise provided in the plans or specifications, unstable and unsuitable material shall be disposed of by the contractor at his expense, outside the limits of the right of way."

Claimant, in preparing its bid for the contract, understood the above quoted special provisions and standard specifications to mean: (1) that the silty topsoil material between the indicated stations was unsuitable material and was to be removed and replaced with suitable material; (2) that the unsuitable material was to be disposed of by the contractor at his expense; (3) that, at

the contractor's election, he could use the unsuitable material for fill in embankments greater than two feet in height, provided claimant placed it in alternate layers with suitable material; and (4) that, notwithstanding the quantity for such excavation shown on the plans, the determination of what was silty material to be removed and replaced would be made by the State's Engineer and the plan quantity for excavation would be adjusted accordingly.

Claimant, relying on this understanding of the language of (3) above, determined that it could furnish a substantially lower bid by not using said unsuitable material in embankments over two feet high, but rather by disposing of it and providing and using suitable material in the embankments. Accordingly, claimant determined and submitted its bid on that basis; namely, on claimant's election to *dispose* of the silty topsoil material and to use, instead, suitable borrow material in the embankments.

Thereafter, the claimant, having submitted the lowest bid, was awarded the job. Accordingly, on February 24, 1969, claimant entered into the aforesaid contract with the respondent. Except for the insertions of claimant's bid prices, this contract is exactly the same as that drafted by respondent for submission to all contractors for bidding.

Claimant commenced work on the job. During the course of the work, respondent's field engineer ordered claimant to use said excavated silty material in embankments of two feet or higher, contending that the election to use said materials rested with respondent. Claimant protested this interpretation of the *Special Provisions*; informed the respondent that the election to use said excavation in the embankments rested with the

claimant; that his proposal had not been based on such re-use; and apprised respondent that its order would necessitate substantial additional expense not provided for in its bid. Respondent, nevertheless, ordered claimant to use this material. Claimant complied under protest.

The issue thus presented to the court is, whether the election to use the silty topsoil (unsuitable material) rests with the claimant contractor or with the State's Engineer. The correct answer depends upon whether the grant of discretion by the word "may" in the following sentence from the "Special Provisions" supra, is addressed to the contractor to respondent's field engineer:

"The excavated material *may* be used in embankments greater than two feet in height and placed in alternate layers with suitable material."

The court takes notice that all of the other four sentences in the same paragraph from which the above sentence is lifted, are obviously all addressed to the contractor, and speak directly to *him.* They instruct *him* as to what *he shall* or *may* do, viz.

- The silty material *shall* be removed to a depth . . . . . . . . . . . . . . .
- The minimum depth of excavation *shall* be 6 inches.
- The width of excavation *shall* extend beneath the pavement . . . . .
- [4] The excavated material *may* be used in embankments . . . . . . . . . .
- [5] The height of embankments *is* to be measured from . . . . . . . . . . .

Respondent admits that the sentences we have numbered 1, 2, 3 and 5 from the paragraph in question speak to the contractor.

Respondent contends, however, that *only one of the sentences* in the paragraph [the sentence we numbered 4] speaks to the engineer, and grants him discretion whether to use the excavated material in embankments over two feet. The language of this paragraph plainly gives no support to respondent's contention.

Nor does the language elsewhere in the contract. We

find that, where the contract *does* give an election or judgment to respondent's engineer, there is an explicit reference to him. For example, at page 4 of the contract, under "Filling Existing Wells":

. . .

5. . . . The material of this portion of the fill, its manner of placement and compaction is *subject to the approval of the engineer* . . .

. . .

8. The balance of the hole is to be filled with sand, embankment material, or other soil *approved by the engineer*; it shall be placed in lifts and compacted *as directed by the engineer*. (Emphasis added.)

Again, following page 18 of the contract, at Special Provisions — "Steady Burning Barricade Lights":

. . . The contractor shall replace all batteries on a group basis at 45 days or such other intervals *as may be specified by the engineer*. (Emphasis added.)

Unlike any of the foregoing provisions, the sentence in dispute ["The excavated material may be used in embankments greater than two feet . . ."] contains no such explicit reference to the engineer. It logically follows that no such reference was intended.

The disputed language, it seems to use, is plain and unambiguous. It tells the contractor *he* has the choice; that he "may" use the excavated material. Plainly, it does not tell him he "may" use the excavated material *if the State so decides*, an interpretation which would still place the election with the contractor. Equally plain, the language contains no explicit directions or reference to the engineer. We must disagree with respondent's contention that none is needed. If the intention had been, as respondent contends, it would have said: the contractor *shall* use the excavated material if the engineer so decides.

"May" does not mean "shall" and it is not so construed in private contracts. *Northwestern Traveling Men's Association* v. *Crawford, 126, Ill. App. 468, 480 (1906) aff'd. 226 Ill. 57.*

In support of its position, respondent points to ¶4 in the quoted section of the Special Provisions, which reads:

"It is hereby understood and agreed that the final determination as to the materials to be removed and replaced will be made by the Engineer in the field and *the plan quantity for earth excavation adjusted accordingly.*" (Emphasis added.)

This paragraph relates to the first paragraph and merely places the final determination of what is to be removed with respondent's engineer. It is apparent, that this authority was given to the engineer to prevent the contractor from performing excessive excavation, with a resulting excessive cost to the State, inasmuch as the compensation to the contractor for excavation was on a cubic yard basis. Our interpretation as to the intent and purpose of the above ¶4 is further supported by the closing clause of that paragraph: " . . . *and the plan quantity for earth excavation adjusted accordingly.*" If there were any question as to the interpretation of this paragraph, the closing clause eliminates it. The closing clause makes it clear that the authority of the engineer in this paragraph is solely to determine and control, for the protection of the State, the quantity of unsuitable material to be excavated, and it informs the contractor that payment would be made on the basis of the actual quantity excavated, as determined by the engineer, and not based on the plan quantity of excavation (the quantity shown on the plans). To give this paragraph any other interpretation, we believe, would emasculate and give no meaning to the words, "*and the plan quantity for earth excavation adjusted accordingly*".

We do not see any inconsistency, as respondent suggests, in the language of the two paragraphs in question. The first one says that the contractor *may* use excavated material. The other says that the field engineer shall make the final determination as the *quantity* of materials to be removed and replaced.

Even if we could in good conscience find that there is more than one reasonable interpretation of the language in question, the doubt must be resolved against the respondent, since the respondent prepared the contract and chose the language. This venerable rule of contract construction, firmly established in Illinois, is restated in *I.L.P. Contracts §221* as follows:

"Words which are ambiguous or of doubtful construction are to be construed most strongly against the party who prepared the contract, for the reason that he chose the language and is responsible for the ambiguities in his own expression.

"This rule obtains not only in grants, but extends in principle to all other engagements and undertakings; and in construing reservations or conditions inserted in a contract for the benefit of the party who makes them, where there are clauses which are doubtful or ambiguous, that construction will be adopted which is least favorable to the party making them."

Repondent's brief does not address itself to the "resolve-doubts-against-the draftsman" rule. Rather, it suggests that the intent of the disputed language in the contract is better understood by (1) reading the contract as a whole and (2) taking judicial notice of a "custom and usage" of which the claimant allegedly had or should have had prior knowledge, viz., "The State has for many years followed the custom of utilizing the silty material in embankments as much as possible for economic reasons." [Departmental Report p. 4.]

Commenting on the last contention first, we believe that it would have been a simple matter for the respondent to have stated the aforesaid custom in its contract, which is so explicit on countless other matters of much less importance. If such a provision had been stated in the written contract, the claimant would not have been misled in submitting his bid, and this claim would not have arisen.

We have carefully examined the authority respondent cites in support of its claim that custom should

override the clear and unambiguous language of a written contract. We believe it would be unconscionable for this court to announce such a rule in the case before us. Such a rule would permit other bidders in the future to be deceived by what purports to be a complete written contract in plain language on which both parties may rely. Here the specific language of the contract clearly distinguishes the case at bar from the rule on which respondent relies in *Chicago Bridge & Iron Co.* v. *Reliance Insurance Co., 46 Ill. 2d 522, 264 N.E. 2d 134 (1970).*

We must reject respondent's argument that "custom and usage" should control our interpretation of this contract, a contention that is contrary to the rules stated in *I.L.P. Contracts, §211* "Custom and usage" and the authority of *Mulliner* v. *Bronson, 14 Ill. App. 355* in which the court said:

" . . . the accustomed mode of dealing between parties in many prior transactions, can not be sustained, for such a private and special custom could not control the express words of the contract."

Turning now to respondent's argument that a different meaning of the contract may be gleaned from reading the contract as a "whole" to the end that we would hold with *U.S. Trust Co. of N.Y.* v. *Jones, 414 Ill. 265, Ill. N.E. 2d 144 (1953),* that

"In construing a written instrument, its letter should be controlled by its spirit and purpose, bearing in mind that the terms employed are servants and not masters of an intent, and are to be interpreted so as to subserve, and not subvert, such intent."

Respondent then states its conclusion that, "the intent of this contract is to give complete and final supervision to the State. Nowhere within the document does any contrary intent exist." In pursuing respondent's thesis, we started with the disputed provision in which we found that the word "may" clearly gives the election

to the contractor and not the State's engineer. We then examined the rest of the contract in a futile search for other language that might change our conclusion.

We have previously reported our analysis of the *Special Provisions* and concluded that ¶4 on page 3, the only part of these provisions on which respondent relies, merely places the determination of the *quantity* of that material which is to be removed and replaced, with the engineer in the field; and directs that the *plan quantity* for each excavation be adjusted accordingly. Thus, the *only* authority delegated to the engineer by said ¶4 is limited to the *quantity of silty topsoil to be removed* (and replaced). Accordingly, ¶4's expressly circumscribed grant of authority to the *engineer* bears no relevant relationship to the use or non-use of the silty material. Our conclusion inescapably follows that the word "may" in ¶2 grants to the *contractor* the sole option to use the silty topsoil in embankments over two feet, or not to use it as claimant determines.

This close textual analysis necessitates our agreeing with claimant's interpretation of the contract and is only confirmed by reading the provisions as an entirety.

Finally, we come to that part of the "whole" contract on which respondent further attempts to support its case, the *Standard Specifications*. In this regard, respondent refers to selected sections therein, some of which are skillfully paraphrased to imply what respondent no doubt wishes it had actually said. Others are irrelevant to the issue here. We find it significant that respondent fails to mention perhaps the most relevant and important provision of all, i.e., the opening sentence of the *Special Provisions* which declares:

> The following *Special Provisions* supplement the "*Standard Specifications* . . ." and in case of conflict with any part or parts of said specifications, the said *Special Provisions* shall take precedence and shall govern.

This provision not only destroys any support for respondent's contentions, but respondent has failed to show any significant conflict between the *Special Provisions* and the *Standard Specifications*. Moreover, if it be assumed *arguendo* that there is a conflict, the contract itself defines the manner of resolution. The *Special Provisions* take precedence. These we have held, as a matter of law, clearly support claimant's interpretation of the contract, and we find no material or significant ambiguities that would require us to support our conclusion on the "resolve doubts against the draftsman" rule.

This court has held in a line of cases over many years that, when the State is responsible for such matters as delays, changes of plans, lack of coordination of prime contractors, or faulty plans, an award will be made for the increased costs incurred, as a result, by claimant contractors.

In *Arcole Construction Company* v. *State of Illinois, 11 C.C.R. 423, (1941),* the government-prepared plans and specifications, including a "typical cross-section" of underground conditions, contained a material misrepresentation which caused the contractor to be misled to his damage. The court held the contractor entitled to recover for these damages. The thrust of *Arcole* applies here. For, whether the focus be on physical condition or right to election, the State has misled the bidder equally.

In the case at bar, the contract clearly prescribed that the contractor "may use excavated material". Nothing in the contract required the claimant to use excavated material. The engineer in the field had no right to compel the contractor to use excavated material in place of suitable material. Clearly, the field engineer only had final determination as the *amount* of unsuitable material

to be removed and replaced, and not as to the re-use of the unsuitable material to be removed and replaced.

For all of the foregoing reasons, this court declares that the election to use or not to use the silty topsoil in embankments greater than two feet in height rested with the claimant, and that claimant is entitled to the damages which resulted from being ordered by the respondent, notwithstanding claimant's protests, to use said material in embankments greater than two feet in height.

This declaration of rights is the only relief sought by the parties in this opinion. If the parties cannot agree and enter into a joint stipulation as to the actual amount of claimant's damages, pursuant to this opinion, further litigation will be necessary on the questions of fact.