MELVIN R. SALKELD, JR., Plaintiff-Appellant, v. V.R. BUSINESS BROKERS *et al.*, Defendants-Appellees (James T. Haley *et al.*, Defendants).

Second District No. 2—89—0159

Opinion filed December 29, 1989.—Rehearing denied February 2, 1990.

Alfred Y. Kirkland, Jr., of Brady, McQueen, Martin, Collins & Jensen, of Elgin (Wiley W. Edmondson, of counsel), for appellant.

Robert L. Caplan, of Hinsdale, for appellees The Buffer Zone, Inc., Innovative Concepts, American Triad Corporation, and Joseph P.S. Licari.

Charles J. Pesek, of Hayes, Pesek & Webb, of Oak Brook, for appellee V.R. Business Brokers, Inc.

Gerald A. Goldman, of Goldman & Marcus, of Chicago (Arthur R.

Ehrlich, of counsel), for appellees Robert Contaldo, Bantam Investment Group, and Frank Contaldo.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, Melvin R. Salkeld, Jr., appeals from an order of the circuit court of Kane County granting the motion of defendants, V.R. Business Brokers, Inc., The Buffer Zone, Inc., American Triad Corp., Innovative Concepts, Bantam Investment Group (Bantam), Joseph P.S. Licari, and Frank and Robert Contaldo. The motion sought a directed verdict on the jury counts and a finding for defendants on the nonjury counts. (A chart diagramming the corporate structure of the parties in this case can be found in Appendix A.) Defendants James T. Haley, Sharon S. Weyland, and William Skala were dismissed from the case before trial and are not parties on appeal. Plaintiff contends that the trial court erred when it determined that (1) the Franchise Disclosure Act (Franchise Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 701 *et seq.*) did not apply to the sublicensing agreement at issue; (2) no jury verdict could possibly stand as to plaintiff's allegations of common-law fraud; and (3) there was no violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). We affirm in part, reverse in part and remand.

On November 16, 1987, plaintiff filed a seven-count complaint in the circuit court of Kane County. Count I alleged a violation of the Franchise Act, counts II through V alleged common-law fraud, and counts VI and VII alleged a violation of the Consumer Fraud Act. The events leading to plaintiff's complaint are summarized as follows.

In May 1986, plaintiff responded to an advertisement in the Chicago Tribune which sought persons to sell and distribute a new product, Cocktails Naturally, in a specific sales territory in Illinois. Plaintiff met with a Bantam account executive and Joseph Licari, at which details of the product and licensing agreements were discussed. Plaintiff stated that he was also given a document titled "SALES MANUAL" (manual) at one of the meetings. The manual described the product in detail and promoted the product's "competitive edge," namely price, quality and convenience. The manual further stated that "[t]here is actually no competition for Cocktails Naturally and it's unique system." In addition, the manual described how the company would provide "table tents, posters, drink menus, drink recipe cards and the original pumps without charge," would train the bartenders on how to use the product, and would provide a rack to organize the flavors behind the bar.

Plaintiff was told at the meetings that the product was "selling well" and that Innovative Concepts would assist him in hiring and training persons to sell the product for him. Plaintiff also received samples of the product to take home and try out. Plaintiff stated that he was impressed with the product.

Plaintiff was also given a copy of a document titled "INNOVATIVE CONCEPTS SUB-LICENSEE PROGRAM." This document highlighted the operating procedures of the company, including the support that each sublicensee would receive from Innovative Concepts. The document described the support as follows:

> "The company assists in all area of marketing. We provide sublicensee training, training (and hiring) of the sales staff, advertising and promotional material, sponsorship of sales contests (March '86 contest winner receives 8 days in Hawaii), National advertising, trade shows, corporate sales and much more.
>
> In short, we are with you every step of the way."

The document also mentioned the absence of competition and gave projections of income based in part on the success rate of salespersons across the country.

Plaintiff also stated that he received a copy of a financial statement for Innovative Concepts, dated May 31, 1986. The statement showed sales of $110,390 for the first five months of 1986, with a net profit of $33,010.

On June 5, 1986, plaintiff and defendant Innovative Concepts, a division of defendant The Buffer Zone, Inc., entered into a sublicensing agreement (agreement). The agreement stated that Innovative Concepts had the authority to grant plaintiff the right to use certain "trademarks, including COCKTAILS NATURALLY which have been registered with the Patent Office of the United States." The agreement provided plaintiff with a specific sales territory, and also committed Innovative Concepts to providing plaintiff with the advice and guidance necessary to run his business. Plaintiff agreed to pay $22,500 to Innovative Concepts, of which $7,500 was paid to defendant Bantam (acting as the salesbroker). The term of the agreement was 20 years.

On June 6, 1986, plaintiff gave his employer notice of his intention to resign and start his own business. In early July 1986, plaintiff began working with his new business. However, plaintiff suffered a heart attack one week after starting the business. He returned to full-time work approximately two weeks later. Plaintiff testified that he made approximately 150 to 170 sales calls during July, August and September, but managed to sell only $900 worth of Cocktails Naturally.

Plaintiff stated that he made several complaints to Licari regarding the lack of sales and support. Plaintiff stated that Licari arranged for a 1½-hour meeting between plaintiff and a California salesman of the product. However, this was the only "support" that Licari provided to plaintiff.

Plaintiff further stated that several of the representations made to him before he signed the agreement proved to be untrue. Plaintiff testified that there was direct competition to Cocktails Naturally, namely a product from the Lani-Kai Company. Plaintiff stated that Lani-Kai sold a similar product for $50-per-case retail, while plaintiff paid $49-per-case wholesale for Cocktails Naturally. Plaintiff stated that the retail price for Cocktails Naturally was $72 per case. In addition, Licari also began to market a competing line of products himself. Plaintiff further stated that there were no sales or marketing systems to assist him in his business, and that he never received any trained personnel from Innovative Concepts. There were no national advertising campaigns, and very little promotional support. Plaintiff also requested documentation of any trademarks, trade names, or patents that were described in the agreement. However, Licari stated that "these documents don't exist."

On cross-examination, plaintiff testified that he also began to market a line of Fosdick turkeys in September 1986. Plaintiff stated that he devoted "part of [his] efforts" to selling the turkeys, but also continued to try to sell the Cocktails Naturally products.

Defendant Joseph Licari testified that plaintiff did not buy a Cocktails Naturally distribution company, but instead bought the right to have Licari supply him with frozen cocktail mix in the future. Licari stated:

"Mr. Salkeld [plaintiff] bought a business from me that had 17 existing accounts. What he bought from me was the right to have [the] product supplied to him in the future. He did not buy a Cocktails Naturally distribution system or a company, whatever you'd like to call it. He bought existing accounts, an existing business."

Licari stated that he did not provide copies of the sublicensee program document, the sales manual, or the financial statement to plaintiff before plaintiff signed the agreement because the documents were not yet in existence. Licari stated that plaintiff signed the agreement in June 1986, but that Licari did not create the documents until July or August 1986. Licari further stated that he would not have given plaintiff a copy of the financial statement because it was only a projection.

Licari also testified that he was providing his customers with a "better product at a better price" than that of Cocktails Naturally at the time plaintiff signed the agreement. Licari stated that plaintiff was aware of this before he signed the agreement. In addition, Licari stated that plaintiff was also aware that Licari was going to set up a corporation (American Triad Corporation) to market frozen cocktail products of better quality and at a lower price than Cocktails Naturally. Licari stated that plaintiff could sell these other products in addition to selling the Cocktails Naturally products.

Defendant Frank Contaldo testified that he was a business broker for defendant V.R. Business Brokers (V.R.). Contaldo explained that V.R. was in the "business of bringing buyers and sellers together." Contaldo stated that Licari contacted him regarding the Cocktails Naturally business and available sales territories in Illinois. Contaldo secured two buyers, plaintiff and Joseph Felice, for Licari, and also participated in the closing of the deals.

Contaldo further stated that his knowledge of Cocktails Naturally came from meetings he had with Licári. Contaldo had no knowledge of whether any patents or trademarks existed for Cocktails Naturally, even though he thought Licari told him of the existence of a trademark in California. Contaldo was also aware of a hiring and training program that Licari was allegedly using for the Cocktails Naturally salespersons.

Following the close of evidence, defendants made a motion for a directed verdict as to the jury counts (counts II through V). The trial court heard arguments on the motion and granted the motion as to all defendants. The court also found in favor of all defendants on the nonjury counts (counts I, VI and VII). Plaintiff's post-trial motion was denied. In addition, the court denied both parties' motions for attorney fees pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—611). Plaintiff filed a timely notice of appeal.

At the outset, we note that neither plaintiff nor defendants have pursued an appeal as to the trial court's rulings on the parties' motions for attorney fees. We also note that plaintiff, in his appellate brief, has admitted that the arguments concerning the Franchise Act and common-law fraud should not include defendant American Triad Corporation, apparently because the corporation did not participate in the agreement or engage in any fraudulent misrepresentations. Thus, we will not include defendant American Triad Corporation in our discussion of these issues.

Plaintiff's first contention on appeal is that the trial court erred in

holding that the Franchise Act did not apply to the sublicensing agreement at issue in this case. Plaintiff argues that the business he purchased falls within the purview of the Franchise Act, and, as such, that the Act would apply to the agreement.

■ Section 3 of the Franchise Act defines a "franchise" as:

"[A] contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons by which:

(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and

(b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logo-type, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(c) the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $100 or more." (Ill. Rev. Stat. 1985, ch. 121½, pars. 703(1)(a) through (1)(c).)

Thus, by statutory definition, a franchise exists where an agreement meets the three objective criteria. (See *Vitkauskas v. State Farm Mutual Automobile Insurance Co.* (1987), 157 Ill. App. 3d 317, 325-26; *Brenkman v. Belmont Marketing, Inc.* (1980), 87 Ill. App. 3d 1060, 1063.) The trial court held that the relationship and transaction involved in the case at bar were not the type to fall within the purview or intent of the Franchise Act.

■ Under the first statutory criterion, plaintiff must demonstrate that defendants granted him the right to sell or distribute the Cocktails Naturally products pursuant to a prescribed marketing plan or system. Defendants argue that there was no evidence of any marketing plan or system in the case at bar. While defendants admit that the agreement that plaintiff signed mentioned the word "system," they contend that there was no description as to what the "system" consisted of. Defendants Licari and Frank Contaldo both testified to and contend on appeal that the "system" referred to the method of mixing and pouring the drinks using the Cocktails Naturally product, and was not used to designate any type of marketing plan. We disagree.

Section 3 of the Franchise Act defines "[m]arketing plan" as:

"[A] plan relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount

plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional materials or cooperation in advertising efforts." Ill. Rev. Stat. 1985, ch. 121½, par. 703(19).

A review of the record indicates that the agreement at issue in the present case satisfies the statutory requirement of a marketing plan or system. Plaintiff was provided a copy of a sales manual detailing product information and sales strategies. The manual stated how to demonstrate the product to the potential customer and mix the drinks. Furthermore, plaintiff was given a document describing the "sub-licensee program" as a program in which the company is "with you [plaintiff] every step of the way." The company promised support in marketing, training, advertising, and promotion. We believe that these representations amply satisfy the statutory requirement of the existence of a marketing plan or system. See *Brenkman*, 87 Ill. App. 3d at 1063-64.

The second statutory criterion concerns the use of a trademark or other commercial symbol designating the franchisor or its affiliate. Defendants contend that the name "Cocktails Naturally" was not substantially associated with the operation of the business. Defendants stated that plaintiff did business under the name "M.S. Distributors," and did not use the Cocktails Naturally name in the written operations of his business. A reading of the agreement at issue in this case indicates that plaintiff was granted the authority to use trademarks associated with Cocktails Naturally. The agreement provided that the "[c]ompany is the authorized Licensee granted certain rights to the use of trademarks, including COCKTAILS NATURALLY which have been registered with the patent Office of the United States." The agreement further provided that the "[s]ub-licensee [plaintiff] regognizes [*sic*] the benefits to be derived from being identified with and sub-licensed by Company [Innovative Concepts and The Buffer Zone], and being able to utilize the systems, *patents, name and marks* which Company makes available to its Sub-Licensee." (Emphasis added.) It is our opinion that these representations were substantially associated with plaintiff's business such that the second statutory requirement was satisfied.

The final statutory requirement is that plaintiff must have paid a fee of $100 or more to be granted the right to engage in the business. Plaintiff asserts, and none of the defendants dispute, that he paid $22,500 for the right to engage in his business. Thus, the third requirement of the statute has been satisfied in this case.

Having determined that each of the statutory requirements

has been satisfied with respect to the existence of a franchise, we next consider whether plaintiff satisfied the notice requirement to properly rescind the sale of the franchise. Under the Franchise Act, it is unlawful to sell a franchise without providing an effective disclosure statement to the purchaser. (Ill. Rev. Stat. 1985, ch. 121½, par. 704(2); *Brenkman*, 87 Ill. App. 3d at 1064.) Where such an unlawful sale occurs, the purchaser shall have a right to rescind the sale provided that notice is sent to all parties from whom recovery will be sought. (*Brenkman*, 87 Ill. App. 3d at 1064.) Notice is timely if it is provided within 90 days from the time that the purchaser first had knowledge of a violation of the Franchise Act. Ill. Rev. Stat. 1985, ch. 121½, par. 721(2)(b); *Brenkman*, 87 Ill. App. 3d at 1064.

In the case at bar, defendants Licari, The Buffer Zone, and Innovative Concepts argue that plaintiff did not satisfy the notice requirements in that he did not provide notice within 90 days from the time in which he first had knowledge of a violation of the Franchise Act. Plaintiff testified that he first became aware of the possible violation of the Franchise Act on October 22, 1986, after he had a meeting with his accountant. Plaintiff contacted an attorney after this meeting and was informed that the agreement may have "involved" the Franchise Act.

While defendants admit that plaintiff served notice within 90 days from October 22, 1986, they contend that plaintiff became aware of the alleged violation before October 22, 1986. To support this position, defendants argue that plaintiff hired an attorney to review the agreement *before* plaintiff signed the agreement. Thus, according to defendants, any violation of the Franchise Act should have been known at that time. We disagree.

Plaintiff's testimony as to when he first became aware of the application of the Franchise Act to the agreement at issue is not contradicted. In addition, the record does not support defendants' contention that plaintiff learned of the violation *before* he signed the agreement. We therefore hold that plaintiff satisfied the notice requirements of the Franchise Act.

We thus conclude that the trial court erred in determining that the agreement at issue in the case at bar did not fall within the purview and intent of the Franchise Act. We make this determination after considering that the Franchise Act was enacted to protect Illinois residents from being misled into making investments for a franchise without first having the information necessary to make an intelligent decision. (Ill. Rev. Stat. 1985, ch. 121½, par. 702(1); *Vitkauskas*, 157 Ill. App. 3d at 325.) The statute was passed to rem-

edy the perceived evil of nondisclosure in a franchise purchase and, as such, must be liberally construed to carry out legislative intent. (*Geri's West, Inc. v. Ferrall* (1987), 153 Ill. App. 3d 579, 583.) As a result, plaintiff has presented a *prima facie* case for the full amount paid for the franchise ($22,500), along with interest at the legal rate from the date of payment (June 6, 1986), less any income received on the franchise ($900), along with reasonable attorney fees. See Ill. Rev. Stat. 1985, ch. 121½, par. 721(2)(a).

Plaintiff next contends that the trial court erred in directing a verdict in favor of all defendants on his common-law fraud counts. Plaintiff argues that he presented evidence as to each element of a *prima facie* case of fraud such that the jury could have found in his favor.

■ A directed verdict is proper only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant such that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Ketchum v. Dura-Bond Concrete, Inc.* (1989), 179 Ill. App. 3d 820, 828-29.

■ In order to establish a *prima facie* case of common-law fraud, the plaintiff must show: (1) that the defendant made a statement; (2) of a material nature as opposed to an opinion; (3) that was untrue; (4) that was known or believed by the person making the statement to be untrue, or made in culpable ignorance of its truth or falsity; (5) that the victim relied upon to his detriment; (6) that the statement was made for the purpose of inducing reliance; and (7) that the victim's reliance led to his injury. (*Richard/Allen/Winter, Ltd. v. Waldorf* (1987), 156 Ill. App. 3d 717, 721; *Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 359.) The plaintiff must prove these elements by clear and convincing evidence. *Parsons*, 142 Ill. App. 3d at 359.

In his amended complaint, plaintiff alleged that defendants made fraudulent misrepresentations concerning the use of trademarks and patents, marketing and training systems, the financial stability of the business and its projected earnings, and the lack of competition for the product. Plaintiff alleged that defendants knew that the representations "were highly unlikely to be true," and that plaintiff relied upon the representations to his detriment.

■ The trial court determined that plaintiff failed to sustain his burden of proof, finding that there were no material representations of present fact. The court also determined that plaintiff had no right to rely on any of the representations, in that by signing the contract, plaintiff "agreed that all these things were merged in the contract."

The court also determined that plaintiff failed to present *prima facie* evidence of damages.

Defendant Licari contends that our supreme court's decision in *Miller v. Whelan* (1895), 158 Ill. 544, supports the trial court's ruling that the representations made before the agreement was signed merged into the agreement and cannot be relied upon to support his allegations of fraud. In *Miller*, the court stated that a trial court may permit a merger if the purposes of justice and the intentions of the parties require it. (*Miller*, 158 Ill. at 555.) However, the court specifically stated that the rule "will not be permitted to be used for the accomplishment of fraud, or of injustice and wrong to others." (*Miller*, 158 Ill. at 555.) In the instant case, plaintiff has alleged fraud in his amended complaint. We do not believe that the ends of justice will be served by allowing the merger clause in the agreement to mask the allegations of fraudulent misrepresentation in plaintiff's amended complaint.

 We now turn to plaintiff's allegations of fraudulent misrepresentation. Plaintiff alleged that defendants represented the existence of patents and trademarks, even though there was no evidence indicating the existence of any patents or trademarks. At trial, plaintiff served defendant Licari with a subpoena requesting defendant to bring in documents showing the existence of patents or trademarks. Licari stated that "these documents don't exist." Licari also stated that he did not investigate whether a patent existed before putting language in the agreement stating that a patent and trademark were available for plaintiff's use.

Defendants argue that plaintiff presented no evidence that the patents did not exist, that the existence of the patents was not material to the transactions, and that plaintiff did not rely upon the representations. We disagree. It was undisputed that defendants represented to plaintiff the existence of patents or trademarks, yet there was no evidence at trial as to their existence. Defendants point out that plaintiff did not request evidence of the patents until Licari was served with a subpoena on the day before the trial. The trial court was concerned with the fairness of the timing of plaintiff's subpoena, and worked out a compromise between the parties as to when Licari would have to produce the documents. Licari failed to produce any documents. It is also apparent that plaintiff relied on the representations, in that he was told of the benefits of being associated with a "name image" like Cocktails Naturally *before* he signed the agreement.

Plaintiff also alleged that defendants' representation that "virtu-

ally no competition existed for Cocktails Naturally" was false and caused him to rely on the statement to his detriment. Defendants emphasized the lack of competition on several occasions in the sales manual and sublicensee program description document. In the sublicensee program document, it was stated that there was "no competition on three levels—PRICE, QUALITY and CONVENIENCE." Evidence of direct competition to Cocktails Naturally was presented at trial. Plaintiff also testified that the lack of competition was an important factor in his decision to sign the agreement.

Defendants argue that the representation of "virtually no competition" was simply an opinion or mere "puffing," and therefore was not a fraudulent misrepresentation. Defendants cite *Spiegel v. Sharp Electronics Corp.* (1984), 125 Ill. App. 3d 897, to support their position. In *Spiegel*, the court held the representations that a photocopier would make "picture perfect copies" and would "reduce error and paper waste" were mere opinions and hence not actionable. (*Spiegel*, 125 Ill. App. 3d at 902.) In addition, in *Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, the court held that descriptions of a house as "magnificent" and "comfortable" were subjective descriptions and thus could not qualify as fraudulent misrepresentations. *Zimmerman*, 156 Ill. App. 3d at 163.

In the case at bar, the evidence did not indicate that the oral and written assertions concerning a lack of competition were mere opinion or "puffing." There was evidence that another product, Lani-Kai, was in direct competition with Cocktails Naturally. In addition, defendant Licari was engaged in a plan of marketing a competing product. Given this evidence of actual competition, a jury could reasonably find that plaintiff relied upon defendants' representations as statements of fact and not as subjective descriptions or mere opinion.

As to plaintiff's allegations concerning marketing, training, financial stability and sales projections, it is our opinion that a jury could find that plaintiff reasonably relied on defendants' alleged untrue representations. Considered together, these representations painted a picture of a company which would "be with [plaintiff] every step of the way." Plaintiff was given a financial statement which Licari described as a mere "projection" and was not known to be accurate. In addition, the sales projections plaintiff received were at an extreme variance from the actual sales that Licari experienced during the first half of 1986. Plaintiff was also told that he would receive the benefits derived from a national advertising and marketing campaign which apparently never materialized.

Defendant Licari also argues that plaintiff's credibility was de-

stroyed when he admitted, among other things, that he was selling Fosdick turkeys with Licari's assistance. However, defendant fails to realize that the credibility of witnesses, including plaintiff, is for the trier of fact to determine. (*National Bank v. County of Will* (1987), 151 Ill. App. 3d 957, 959.) The jury, as the trier of fact on the common-law fraud counts, never got to consider the weight and quality of the evidence because the trial court directed a verdict in favor of all defendants.

We find that plaintiff has made out a *prima facie* case of fraud, and thus hold that the trial court erred in directing a verdict in favor of defendants Licari, The Buffer Zone, Inc., and Innovative Concepts.

■■■ We next address whether the trial court erred in directing a verdict in favor of defendants V.R., Bantam, and Frank and Robert Contaldo (the Contaldos). These defendants argue that they did not make any representations, fraudulent or otherwise, and were acting simply as a broker or messenger between plaintiff and defendant Licari. As such, these defendants contend that plaintiff failed to present a *prima facie* case of fraud as to them. We agree.

A review of the record indicates that these defendants were business brokers between Licari's corporations and plaintiff. Plaintiff's only contacts with these defendants included the initial meeting, which introduced plaintiff to the product, and the meeting at which time plaintiff signed the agreement. A representative of Bantam was also present at plaintiff's first meeting with Licari, apparently to introduce plaintiff to Licari. There was no evidence to indicate that any of these defendants made any of the representations that plaintiff alleged were fraudulent. Instead, it was Licari who made the misrepresentations to plaintiff.

We do not believe that V.R., Bantam, or the Contaldos, acting as business brokers, had a duty to independently substantiate Licari's representations absent any facts indicating that the representations were untrue. (*Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 182; *Lyons v. Christ Episcopal Church* (1979), 71 Ill. App. 3d 257, 260; Restatement (Second) of Agency §348, comment *b* (1958).) These defendants had no reason to believe that Licari's representations were false, any more than plaintiff had any reason to believe they were false. Absent any duty or reason to investigate Licari's representations, we do not believe that these defendants should be held liable for Licari's misrepresentations. Thus, the trial court properly directed a verdict in favor of defendants V.R., Bantam, and the Contaldos.

■■■ Plaintiff's final contention on appeal is that the trial court's

finding in favor of all defendants on counts VI and VII of his amended complaint was against the manifest weight of the evidence. In counts VI and VII, plaintiff alleged a violation of the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). Section 2 of the Consumer Fraud Act states, in pertinent part:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." (Ill. Rev. Stat. 1985, ch. 121½, par. 262.)

The Consumer Fraud Act is intended to provide broader consumer protection than the common-law action of fraud. (*Munjal*, 138 Ill. App. 3d at 182; *Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 306.) As such, a plaintiff alleging a violation of the Consumer Fraud Act is not required to establish all of the elements of fraud. A plaintiff is not required to show actual reliance on the misstatements and can also recover for innocent misrepresentations. (*Munjal*, 138 Ill. App. 3d at 182-83; *Beard v. Gress* (1980), 90 Ill. App. 3d 622, 627-28.) It has been stated that the legislature has sent a mandate to the courts to utilize the Consumer Fraud Act to eradicate all forms of deceptive and unfair business practices. *Buzzard v. Bolger* (1983), 117 Ill. App. 3d 887, 893; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 198.

██ We have already determined that plaintiff stated a *prima facie* case of common-law fraud as to defendants Licari, The Buffer Zone, and Innovative Concepts. After considering all of the evidence adduced at trial, we believe that this determination is sufficient to warrant the conclusion that the same acts violated the Consumer Fraud Act because the Act prohibits any misrepresentation at all. (See *Zimmerman*, 156 Ill. App. 3d at 168.) Defendants painted an inaccurate and deceptive picture of a company supporting plaintiff with trademarks, patents, advertising, marketing, training, and promotional support, without any competing products to contend with. This conduct of defendants was misleading and deceptive within the meaning of the Consumer Fraud Act. As such, we hold that the trial court's directed finding as to these defendants was against the manifest weight of the evidence.

██ As to defendants V.R., Bantam, and the Contaldos, we have

already determined that plaintiff failed to state a *prima facie* case as to the common-law fraud counts. We have already determined that these defendants did not make any fraudulent misrepresentations or omissions. In addition, a review of the record fails to reveal that these defendants participated in any deceptive acts or conduct. The Consumer Fraud Act is not intended to transform nondeceptive and nonfraudulent statements or omissions into actionable ones. *Kellerman*, 132 Ill. App. 3d at 306.

We do not agree with plaintiff's contention that these defendants have violated the Consumer Fraud Act, and thus hold that the trial court properly directed a finding in favor of these defendants. In addition, we also believe that the court properly directed a finding in favor of defendant American Triad Corporation, as there was no evidence that this corporation made any fraudulent misrepresentations or in any way participated in any activity which violated the Consumer Fraud Act.

For the above-stated reasons, the judgment of the circuit court of Kane County with respect to count I of plaintiff's amended complaint is reversed and remanded as to all defendants except American Triad Corporation. On remand, the trial court should proceed with count I as though the court had originally denied defendants' motion for a directed finding. (See 107 Ill. 2d R. 366(b)(3)(iii); *Wilbur v. Potpora* (1984), 123 Ill. App. 3d 166, 171.) As to counts II through V (common-law fraud), the judgment as to defendants The Buffer Zone, Inc., Innovative Concepts, and Licari is reversed, and the cause remanded for a new trial. In addition, with respect to counts VI and VII (consumer fraud), the judgment as to defendants The Buffer Zone, Inc., Innovative Concepts, and Licari is reversed and remanded with directions that the trial court proceed with the counts as though defendants' motion for a directed finding was originally denied. (See 107 Ill. 2d R. 366(b)(3)(iii); *Wilbur*, 123 Ill. App. 3d at 171.) As to defendants V.R., Bantam, and the Contaldos, the judgment with respect to counts II through VII is affirmed. With respect to defendant American Triad Corporation, the judgment as to all counts is affirmed.

Affirmed in part; reversed in part and remanded.

UNVERZAGT, P.J., and REINHARD, J., concur.

APPENDIX A