CONSOLIDATED BEARINGS COMPA-
NY, Plaintiff and
Counterdefendant–Appellee,

v.

EHRET–KROHN CORPORATION,
Defendant, Counterplaintiff and
Third–Party Plaintiff–Appellant,

v.

Ralph N. MEERWARTH, Third–Party
Defendant–Appellee.

No. 89–2779.

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1990.

Decided Sept. 20, 1990.

A. Benjamin Goldgar, James J. Casey, James T. Otis, Keck, Mahin & Cate, Chicago, Ill., for Consolidated Bearings Co. and Ralph N. Meerwarth.

Cornelius P. Callahan, Mark E. Christensen, Callahan & Ehret, Chicago, Ill., for Ehret–Krohn Corp.

Before POSNER, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

This diversity case arose when the Consolidated Bearings Company ("Consolidated") terminated Ehret–Krohn Corporation's ("Ehret") distributorship in 1982. Ehret refused to return consigned inventory to Consolidated and Consolidated sought replevin. Ehret counterclaimed, alleging that Consolidated wrongfully terminated

the contract, fraudulently induced Ehret to enter into the contract in 1973 and to accept a reduced commission schedule after 1975, and owed it commissions for storing the bearings after Consolidated cancelled the contract.[1] The trial court severed the complaint and counterclaims. A jury denied the replevin complaint; the district judge granted Consolidated's motion for a directed verdict on each counterclaim. Ehret appeals the directed verdicts. We find that the judge should have given two of the counterclaims to the jury and therefore vacate the judgment in part and remand those claims for trial.

### I. *Facts*

Consolidated imports ball bearings from Europe and Asia and sells them in the United States through a network of regional distributors. In June of 1972, Consolidated was seeking a midwest distributor for its bearings, and proposed that Ehret, a representative of various industrial manufacturers, fill that niche. The two companies executed a contract in January, 1973, in which Consolidated agreed to pay Ehret a ten percent commission on sales to aftermarket distributors[2] in its territory and a five percent commission on sales to original equipment manufacturers ("OEMs"). The contract provided for an additional five percent payment on shipments made from Ehret's Chicago warehouse. In return, the agreement required Ehret to service and solicit aftermarket and OEM accounts and to file monthly reports of visits to those accounts ("call reports"). The contract renewed automatically each year absent a notice of termination by either party 60 days before the annual expiration date.

Things went well at the beginning. Consolidated's sales in the region increased from approximately $75,000 in 1972 to $155,000 in 1973 and over $400,000 in 1974 and 1975. Consolidated's overall sales and profits increased in equally dramatic fashion. Gross sales rose from $2.8 million in 1972 to almost $8.5 million in 1975; Consol-

idated's net profits increased from $44,416 in 1972 to $81,152 in 1973 and $315,547 in 1974. Net profits declined slightly to $273,663 in 1975. Ralph Meerwarth, then Consolidated's vice president, received (along with his father) salary increases of over $50,000 in 1974 and almost $8,000 in 1975.

Nevertheless, in June, 1975, Meerwarth phoned John Ehret, president of Ehret–Krohn, and told him that fluctuations in the German deutschemark were contributing to "losses in his company." Meerwarth claimed that, because of these losses, the only way he could survive was to withdraw from the market unless Ehret was willing to accept a temporary reduction in its commissions. He added that he was asking all his distributors to do the same. Ehret agreed to the requested reduction on the condition that Consolidated agree to terminate the contract only for "serious cause." Under the revised commission schedule, Ehret received a ten percent commission on its first $350,000 in sales to aftermarket distributors, and five percent on sales beyond that amount.

The parties operated under the modified contract until 1982. On January 15, 1982, Meerwarth sent Ehret a letter cancelling the contract effective March 19, stating that Ehret had failed to file call reports and to service and solicit OEM accounts. In place of the original contract, Consolidated proposed a new contract under which Ehret would not receive commissions on sales to OEM accounts it failed to service. The parties negotiated the proposed contract, but continued doing business under the terms of the original contract until November, when Consolidated notified Ehret that it was terminating their relationship on November 30 unless Ehret signed the revised contract. During this interval, John Ehret requested that Consolidated restore the commission rate to ten percent; in response, Paul Bederson, Consolidated's vice president for finance told him: "Come off

---

1. Ehret also claimed at trial that Consolidated owes future commissions derived from sales to Ehret's customers but does not appeal on this ground.

2. Typically, repair facilities and smaller distributors and retailers selling to the public.

it, John. Ralph was never really going to pay ten percent commission. That was just a titty up front to suck you in."

## II. *Fraud*

Ehret claims fraud largely on the basis of this comment.[3] Consolidated's promise to pay a ten percent commission in 1973, it argues, was part of a scheme to sucker Ehret into the contract and then to pull the rug out once Ehret had made investments that it would have to eat if Consolidated cancelled the contract. Ehret contends that Consolidated accomplished its scheme in 1975 when Meerwarth extorted a fifty percent reduction in the commission schedule.

■■■ When reviewing directed verdicts in diversity cases, we use the state's standard of review. *Mele v. Sherman Hosp.*, 838 F.2d 923, 924 (7th Cir.1988). The parties agree that the Illinois standard is set forth in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–14 (1967): "[V]erdicts ought to be directed ... only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *See also Kokinis v. Kotrich*, 81 Ill.2d 151, 154–55, 40 Ill.Dec. 812, 813–14, 407 N.E.2d 43, 44–45 (1980) (restating *Pedrick*). To prove its fraud claims, Ehret had to show that Consolidated knowingly made false statements of material fact with the intent to induce Ehret's actions and that Ehret reasonably relied to its detriment on those statements. *Soules v. Gen-eral Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980). Each of these elements must be proved by clear and convincing evidence. *Hofmann v. Hofmann*, 94 Ill.2d 205, 222, 68 Ill.Dec. 593, 600, 446 N.E.2d 499, 506 (1983); *Niemoth v. Kohls*, 171 Ill.App.3d 54, 68, 121 Ill.Dec. 37, 46, 524 N.E.2d 1085, 1094 (1988); *Kinsey v. Scott*, 124 Ill.App.3d 329, 336, 79 Ill.Dec. 584, 589, 463 N.E.2d 1359, 1364 (1984).[4]

■■■ Ehret's 1973 fraud claim fails to measure up. Meerwarth's agreement to pay a 10 percent commission was not a statement of material fact; it was a promise. Ehret invokes an Illinois rule that holds actionable promises that are "part of a scheme to defraud," *General Motors Acceptance Corp. v. Central Nat'l Bank*, 773 F.2d 771, 780 (7th Cir.1985) (citing Illinois law), but that exception applies only when the promise is not carried out. *See, e.g.,* *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 334, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977) (exception applies to *false* promises); *Willis v. Atkins*, 412 Ill. 245, 257–58, 106 N.E.2d 370, 377 (1952) (exception applied to scheme to defraud widow through false promises of marriage); *Roda v. Berko*, 401 Ill. 335, 341, 81 N.E.2d 912, 915 (1948) (exception applies to deed transferred on basis of false promise). Consolidated paid ten percent commissions for over two years until the contract was modified in 1975. Ehret relies on Bederson's statement that Meerwarth's promise to pay ten percent commissions was "a titty up front" to link the 1973 contract and

---

3. In a letter written on December 1, 1982, Ehret told Ralph Meerwarth that "all of this problem stems from Paul Bederson's statement about your 10% inducement...."

4. In federal cases, appellate review of directed verdicts is governed by the plaintiff's evidentiary burden. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1985) (appellate review of directed verdicts in first amendment defamation cases governed by "clear and convincing evidence" standard applicable in such cases). Illinois, however, has yet to explicitly adopt this approach, and its courts apply the general *Pedrick* and *Kokinis* standards when reviewing directed verdicts on fraud claims. *See, e.g., Salkeld v. V.R. Bus. Brokers*, 192 Ill.App.3d 663, 673, 139 Ill.Dec. 595, 603, 548 N.E.2d 1151, 1159 (1989); *McCarthy v. Carefree Vacations, Inc.*, 171 Ill.App.3d 1050, 1053, 121 Ill.Dec. 465, 467, 525 N.E.2d 271, 273 (1988); *First Nat'l Bank v. St. Charles Nat'l Bank*, 152 Ill.App.3d 923, 935, 105 Ill.Dec. 739, 747, 504 N.E.2d 1257, 1265 (1987). Nevertheless, *Pedrick* implicitly requires reference to the evidentiary burden at trial; the reviewing court must determine whether there was sufficient evidence to support a verdict contrary to the directed verdict. A directed verdict disposing of a fraud claim, then, is proper only if the evidence unquestionably falls short of the "clear and convincing" benchmark.

1975 modification into a prolonged fraudulent scheme. That statement, however, made ten years after the fact by one who was not even a Consolidated employee in 1972, falls far short of clear and convincing proof that Meerwarth intended to defraud Ehret from the ·beginning. It is directly contradicted by evidence that Consolidated paid Ehret ten percent commissions for over two years, and continued to pay ten percent on the first $350,000 in sales for the life of the contract. Ehret notes that "at least half a dozen times prior to Meerwarth's phone call in June of 1975 the Deutschemark was at a price as high as it was in June of 1975," Appellant's Brief at 30, but that merely shows that Meerwarth had no need to wait until June, 1975, to spring a trap. Ehret made the necessary capital investments in 1973 when it entered into the contract, and it was vulnerable to opportunistic behavior from that point on.[5] Finally, the contract was, before 1975, terminable at will; Ehret took a calculated risk (one that it eliminated in 1975) when it agreed to the original termination provision. Consolidated did not promise a ten percent commission *ad infinitum* and Ehret could not have reasonably relied on the prospect of receiving that commission rate indefinitely.

The 1975 fraud claim presents more substance. Ehret contends that Meerwarth misrepresented Consolidated's financial status to coerce it to accept a fifty percent reduction in its commissions. Consolidated counters that Meerwarth's statements were merely opinions—"a kind of reverse 'puffing' "—to which businessmen are prone; it also contends that the statements were accurate and that Ehret did not rely on them in entering into the 1975 contract modification. The district court agreed.

Whether or not we also agree, we must reverse the district court's directed verdict. First, we cannot say that a reasonable jury could not have concluded with the requisite certainty that the statements were false

assertions of fact. Ehret presented evidence showing that Meerwarth phoned John Ehret, told him that Consolidated was suffering financial losses caused, at least in part, by fluctuations in the German deutschemark, and that the only way Consolidated could survive was if its regional distributors agreed to reductions in their commission schedules. The court concluded that Meerwarth's statements were opinions largely because they lacked specificity, but there is little reason to suppose that statements of fact are, by their nature, more detailed than expressions of opinion; one may render a detailed opinion as easily as a detailed statement. (One might even suppose that swindlers would avoid specificity in their misrepresentations to preserve their flexibility and to preclude tripping over extraneous details.) The jury need not have known the source or the cause of the losses cited by Meerwarth to decide whether he was expressing an opinion or intended to defraud Ehret; it was sufficient that the evidence showed that, whatever the specifics, Meerwarth told Ehret that Consolidated was losing money when, in fact, it was not. "Illinois law is well settled, holding consistently that although representations of future income are not actionable, representations as to past income of a business constitute statements of fact." *Mother Earth, Ltd. v. Strawberry Camel, Ltd.,* 72 Ill.App.3d 37, 48, 28 Ill.Dec. 226, 237, 390 N.E.2d 393, 403 (1979); *accord Niemoth,* 171 Ill.App.3d at 69, 121 Ill.Dec. at 46, 524 N.E.2d at 1094; *cf. Bergman & Lefkow Ins. Agency v. Flash Cab Co.,* 110 Ill.App.2d 415, 425, 249 N.E.2d 729, 734 (1969) (false representations of financial soundness made by third parties held actionable). Moreover, Meerwarth offered his statement that Consolidated "could not survive" without the commission reductions in the guise of fact; "[w]herever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact ... then the statement clearly be-

---

**5.** We note also that Meerwarth did not have to wait until 1975 to threaten Ehret's investment of goodwill either. Ehret's goodwill was already well established in 1973; Consolidated sought out Ehret, in part, because Ehret was already representing a variety of manufacturers.

comes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation." *Id.* at 424, 249 N.E.2d at 734 (quoting *Buttitta v. Lawrence*, 346 Ill. 164, 173, 178 N.E. 390, 393 (1931)); *see, e.g., Salkeld v. V.R. Business Brokers*, 192 Ill.App.3d 663, 675, 139 Ill.Dec. 595, 602, 548 N.E.2d 1151, 1158 (1989) (reversing trial court's directed verdict based, in part, on finding that defendant's representation that "virtually no competition existed" for product constituted an opinion or mere puffing). Finally, we note that there was no evidence that Meerwarth intended the statements to be anything but assertions of fact, while Consolidated's theory that they were merely opinions is purely speculative.

Ehret also presented ample evidence to support its claim that the statements were false. The evidence showed that Consolidated's sales and gross profits continued to rise in 1975, as did the salaries of Meerwarth and his father. Aftertax profits did decline in 1975, but they were still more than triple their 1973 level. Had Meerwarth and his father not received hefty pay raises in 1974 and 1975, net profits would have been still higher. The cost of goods sold as a percentage of sales remained relatively constant through 1975, indicating that the deutschemark fluctuations had little adverse effect on Consolidated's profits.

Consolidated concedes that it "was indeed very successful" in 1973 and 1974, and that it was not facing insolvency in 1975. Appellee's Brief at 44–45. Nevertheless, it argues that the reduction in its *rate* of growth in 1975 justified Meerwarth's comments that Consolidated was suffering financial troubles that threatened its existence. A declining growth rate is hardly indicative of a firm's imminent collapse, however; no business can sustain increasing growth rates indefinitely. Thus, it would not have been unreasonable for a jury to conclude that the evidence showed with convincing clarity that Meerwarth's statements were false and that he intended to deceive Ehret about Consolidated's financial position to secure Ehret's consent to reduced commissions.

Consolidated also argues that Ehret did not rely on Meerwarth's statements. Ehret, it contends, was motivated to accept the modification not by Meerwarth's statements, but by its desire to add the serious cause requirement to the termination provision. This argument confuses reliance with negotiation. Ehret's attempt to get something in return for its concession does not negate its reliance on Meerwarth's statements to establish the context for seeking more protection against unwarranted terminations.

The trial judge concluded only that Ehret's reliance was not reasonable. The court based this holding, in part, on its view, previously discussed, that Meerwarth's statements were merely opinions. The trial judge also noted, however, that Ehret renewed the contract with the reduced commission schedule each year until 1982 without ever raising a claim of fraud. While Ehret's continued reliance on Meerwarth's statements after economic conditions improved may be relevant to the extent of its damages, it is not relevant to the question of whether Ehret's initial reliance was reasonable. As the district court itself noted immediately before discussing the reliance issue, "the conduct of the parties has to be examined regarding this statement *at the time it was made.*" The court should have focused exclusively on whether Ehret justifiably relied on Meerwarth's statements when it first agreed to the contract modification.

A jury could have found Ehret's immediate reliance reasonable. We recently noted that reasonableness is measured differently in fraud cases than in other contexts; "the victim of a deliberate fraud ... need only avoid *deliberate or reckless* risk-taking." *Ampat/Midwest, Inc. v. Illinois Tool Works*, 896 F.2d 1035, 1041–42 (7th Cir.1990). "Unlike the victim of a nondeliberate tort, the victim of a fraud is not obliged to dig beneath apparently adequate assurances ... merely because the circumstances might engender suspicion in the proverbial reasonable man." *Id.* at 1042. Ehret might not have thought it was sacrificing much at the time. It agreed only to a reduced commission after $350,000 in

**1230**

sales and its sales in 1974 and 1975 were about $400,000. Moreover, faced with the apparent prospect of Consolidated's insolvency if it did not agree to the reduced commission, Ehret had little choice but to rely on Meerwarth's representations and no reason to suspect that they were false. Ehret had no access to Consolidated's financial statements and the deutschemark was indeed fluctuating at the time. As we noted in *Ampat/Midwest*, "[i]t is not ordinary prudence to assume that your seller is a liar." *Id.* at 1043.

### III. *Wrongful Termination*

Ehret also alleged that Consolidated breached the contract in 1982 when it terminated Ehret as a distributor. Consolidated notified Ehret of its intent to cancel the contract on January 15, 1982, more than 60 days before the annual expiration date of March 19, based on Ehret's failure to file call reports and to service OEM accounts. Ehret disputes these claims and adds that neither reason constitutes a "serious cause" for the termination as required by the contract. It further contends that, because Consolidated lacked serious cause and the parties continued to do business under the old contract, Consolidated's notice of cancellation was ineffective and the contract automatically renewed on March 19, 1982. Consolidated *really* cancelled the contract, according to Ehret, when it sent a cancellation letter on November 22, effective November 30, violating the 60 day notice provision.

 The contract did not renew on March 19 simply because the parties continued to do business governed by its terms. True, when an employee continues working under a contract after its expiration, a presumption does arise that the contract is renewed. *See Foster v. Springfield Clinic*, 88 Ill.App.3d 459, 463, 43 Ill.Dec. 604, 607, 410 N.E.2d 604, 607 (1980). But evidence that the parties were negotiating a new contract rebuts the presumption by negating the inference that either party believed the contract had been renewed. *Id.*, 43 Ill.Dec. at 607–08, 410 N.E.2d at 607–08; *Davis v. Tampico Farmers Mutu-*

*al Tel. Co.*, 332 Ill.App. 200, 204–05, 74 N.E.2d 721, 723 (1947); *Borg–Warner Corp. v. Ostertag*, 18 Wis.2d 484, 489, 118 N.W.2d 900, 903 (1963). Ehret objects that it did not negotiate with Consolidated about a new contract. Negotiations, however, are only evidence that a party is on notice that the contract will not be renewed; Consolidated gave Ehret written notice to the same effect. Moreover, the evidence shows that Ehret did negotiate. John Ehret testified that, although he refused to sign the new contract, he made several attempts to convince Consolidated to restore the ten percent commission rate. Ralph Meerwarth testified that he had several conversations with John Ehret about the new contract and that Mr. Ehret told him in April that he wanted additional time to study the contract; John Ehret repeated that request when he traveled to Consolidated's headquarters in September, 1982. Paul Bederson, Consolidated's vice president of finance, later traveled to Chicago and John Ehret again discussed increasing the commission rate. In view of this evidence, we cannot reasonably characterize Ehret's stance as a refusal to negotiate.

We agree, therefore, with Consolidated's position that it cancelled the contract in a timely fashion. The contract required only 60 days notice to cancel; it did not condition the exercise of that right on mutual agreement that there was serious cause to justify the cancellation. Ehret can claim breach of contract on the ground that Consolidated lacked serious cause to cancel the contract, but it cannot manufacture an additional claim by denying effect to the timely cancellation and asserting that subsequent, additional, notice was inadequate. Ehret had more notice, not less, than the contract required.

 A jury could have found, however, that—although timely—the termination was wrongful. Consolidated justified its action by claiming that Ehret had failed to file "follow-up 'monthly reports'" and to service OEM accounts. Consolidated reports that on cross-examination Ehret admitted that neither he nor his salesmen submitted the required reports, but our

review of the record reveals that Ehret was responding to a question about "weekly field office reports," not the monthly reports required by the contract. Although Consolidated sent two letters in 1975 requesting the weekly reports, the contract did not obligate the company to provide them. Ehret testified that his company filed the required monthly reports [6] between 1976 and 1981 "whenever something needed to be passed on," and cites Bederson's 1975 letter as authority for modifying the reporting schedule.[7] Bederson's letter stated that Ehret need file reports only "if there are significant facts to report."

■■■■■■■ Consolidated argues that Bederson's letter did not change the reporting requirement because the contract required John Ehret's signature for modifications. "[W]hether the signing of the instrument is a condition precedent to its becoming a binding contract [however,] usually depends upon the intention of the parties." *Lynge v. Kunstmann*, 94 Ill.App.3d 689, 694, 50 Ill.Dec. 146, 150, 418 N.E.2d 1140, 1144 (1981). While the parties clearly intended to make their *own* signatures a prerequisite to a contract modification, it is not clear that they sought the signature of the other party for the same purpose. The presumption is that they did not.[8] "The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties." *Id.* The statute of frauds requires only the signature of the party to be charged, and Illinois courts have held that a contract signed by the party to be charged may be enforced against him even if the complaining party

did not sign it and even if it falls outside the statute of frauds. *See, e.g., In re Marriage of Kloster*, 127 Ill.App.3d 583, 585, 82 Ill.Dec. 847, 849, 469 N.E.2d 381, 383 (1984); *Glabman v. Bouhall*, 81 Ill.App.3d 966, 969, 36 Ill.Dec. 852, 855, 401 N.E.2d 990, 993 (1980). Moreover, in Illinois, parties may even modify contracts orally after including a contract provision that precludes oral modification. *Falcon, Ltd. v. Corr's Natural Beverages*, 165 Ill.App.3d 815, 821, 117 Ill.Dec. 480, 484, 520 N.E.2d 831, 835 (1987); *Monarch Coaches v. ITT Indus. Credit*, 818 F.2d 11, 12 (7th Cir. 1987); *Mayer Paving & Asphalt v. Carl A. Morse, Inc.*, 48 Ill.App.3d 73, 80, 8 Ill.Dec. 122, 127, 365 N.E.2d 360, 365 (1977). We therefore conclude that Illinois courts would enforce the modified reporting requirements included in Bederson's 1975 letter; a jury could thus have found that Ehret satisfied its obligation to file reports.

Even if Ehret did not file the reports as required, a jury could have reasonably concluded that Consolidated did not consider this failure to be a serious matter. Meerwarth testified that it was, but between December 8, 1975 and January 15, 1982—over six years—there was no correspondence between Consolidated and Ehret on the subject of call reports. Ehret testified that, over the entire life of the contract, Consolidated complained to him by phone about call reports fewer than five times. Moreover, only when Consolidated decided to cancel the contract did it ever indicate that it considered the submission of the reports to be essential to its relationship with Ehret. This evidence permits two reasonable inferences: either Ehret filed the

---

**6.** John Ehret and his counsel called these reports "sales" reports rather than "monthly" reports, but we think it reasonable for a jury to assume that he was referring to the reports required by the contract since he was responding to a question about whether he agreed with Meerwarth's assertion in the January, 1982 termination letter, that Ehret had failed to file the required "monthly" reports. Moreover, Paul Bederson's 1975 letter on the subject also referred to the reports required by the contract as "sales" reports.

**7.** Mr. Ehret also maintains that Meerwarth told him, in 1972, that Ehret would not have to file any call reports. This statement, Ehret argues,

negates the provision in the written contract. We disagree. The parole evidence rule bars the statement. Ehret asserts that Consolidated waived its parole evidence objection at trial; even if true, the statement fails to establish the clear and convincing proof necessary to overcome the presumption that the written contract manifested the parties' intent with regard to the reports. *See Vallarta v. Lee Optical*, 12 Ill. App.3d 112, 115–16, 298 N.E.2d 212, 215 (1973).

**8.** Although Consolidated raised this issue, it presented no evidence that it intended Ehret's signature to be a condition precedent to its own duty to perform.

reports after all, or the lack of reports was not serious. Under either view, the jury could have found for Ehret.

■■■ Whether or not it found that failure to file the reports constituted serious cause, a jury could also have found that Consolidated waived the reporting requirement.[9] "Waiver, the intentional relinquishment of a known right, can arise either expressly or by conduct inconsistent with an intent to enforce the right." *Wald v. Chicago Shippers Ass'n*, 175 Ill.App.3d 607, 621, 125 Ill.Dec. 62, 71, 529 N.E.2d 1138, 1147 (1988); *see also Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979). In *Saverslak*, which Consolidated cites to support its argument that it did not waive the reporting provision, this Court held that, as a matter of law, the plaintiff's failure to enforce a contractual right over a period of seven years constituted a waiver of his right to sue for damages caused by defendant's breach, noting that "[a]t some point, ... which we need not fix, ... silent acquiescence ripened into an intentional relinquishment of his right to enforce...." *Id.* at 214. Today, we need say only that a jury could have concluded that Consolidated's acquiescence had ripened into a waiver after six years.

The same arguments can be made respecting Ehret's alleged failure to solicit and service OEM accounts. First, a reasonable jury could have concluded that Ehret satisfied its contractual obligations with regard to OEM accounts. The evidence suggested that Ehret added some OEM accounts during the life of the contract, and the contract required no minimum level of sales to OEMs. Moreover, Ehret's total sales (to both aftermarket distributors and to OEMs) topped $1.3 million in both 1980 and 1981; the jury could have concluded that Consolidated was more interested in this attractive bottom line than in its component parts.[10] This evidence is hardly overwhelming (on average, OEM sales accounted for only one to two percent of Ehret's sales), but we stress that we are limited to determining whether a jury verdict supporting Ehret's position could stand. We note also that the evidence that Consolidated was unconcerned about, or waived altogether, the OEM sales requirement is even stronger than that relevant to waiver of the reporting requirements; during the ten year life of the contract, Consolidated never expressed dissatisfaction with Ehret's sales to OEMs until it cited this failure as ground for cancelling the contract. Accordingly, we conclude that a jury could have found that Consolidated lacked serious cause to cancel the contract.

### IV. *Warehouse Commissions*

Ehret's final claim on appeal is that it was entitled to receive a five percent commission on the bearings stored in its warehouse after Consolidated cancelled the contract. Ehret acknowledges that the contract said nothing about fees for warehousing bearings after termination; it provided only for a five percent commission on shipments made from its warehouse to custom-

9. Ehret also contends, on appeal, that Consolidated is estopped from asserting that failure to file call reports constituted serious cause for terminating the contract. It adds that it substantially performed its duty to file them. Ehret failed to raise these arguments in the district court, however, and is therefore barred from raising them on appeal. *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft*, 855 F.2d 385, 390 (7th Cir.1988). Ehret argues that "waiver, estoppel and substantial performance are three heads on one body and are fundamentally inherent in the arguments made to the trial court on the motion for directed verdict." Appellant's Reply Br. at 10. We have noted previously, however, that estoppel and waiver, though often used interchangeably, are in fact two distinct arguments that must be addressed separately. *See Saverslak*, 606 F.2d at 213. Moreover, a substantial performance argument,

by definition, focuses on *performance* rather than *nonperformance*; it simply cannot be considered the functional equivalent of waiver and estoppel. Both theories are distinct, and Ehret said nothing to the trial court to suggest that either might be applicable. Ehret focused exclusively on waiver; it ought, then, recognize its own.

10. We disregard Ehret's evidence that Ralph Meerwarth discouraged it from actively pursuing OEM accounts. That evidence consists of a single statement made before the contract was signed. We note again (*see* n. 7) that even if the parole evidence rule does not bar our consideration of this evidence (it does), one uncorroborated statement falls short of establishing with convincing certainty that the relevant contract provision does not accurately reflect the intent of the parties.

ers within its territory and on shipments directed by Consolidated to customers outside Ehret's territory. Ehret claims, nonetheless, that the contract evinces Consolidated's intent to reimburse it for its warehousing costs, even after termination. It argues that, because the contract does not mention warehouse fees upon termination, it is ambiguous and the parties' intent should be considered.

Silence creates ambiguity, however, only when the silence involves a matter naturally within the scope of the contract as written. A contract is not ambiguous merely because it fails to address some contingency; the general presumption is that "the rights of the parties are limited to the terms expressed" in the contract. *In re Estate of Morrow*, 150 Ill.App.3d 500, 505, 103 Ill.Dec. 681, 685, 501 N.E.2d 998, 1002 (1986); *A.A. Conte, Inc. v. Campbell–Lowrie–Lautermilch Corp.*, 132 Ill.App.3d 325, 329, 87 Ill.Dec. 429, 432, 477 N.E.2d 30, 33 (1985). The language of the contract is unambiguous, as far as it goes, and we cannot follow the logic Ehret employs in concluding that Consolidated, because it agreed to reimburse Ehret's warehouse fees during the life of the contract, also intended to reimburse it for expenses incurred *after* one party cancelled the contract. The contract provides no agreement about the respective rights between the parties upon cancellation; we conclude that the parties did not intend one. Moreover, even if we found the contract was ambiguous, so that extrinsic evidence could be considered, we would reach the same conclusion. The evidence indicated that Consolidated never paid sales commissions when its distributors returned bearings to its headquarters in New Jersey; Ehret had returned bearings to Consolidated in the past and had never received, nor demanded, warehouse commissions for storing those bearings.

Alternatively, Ehret argues that common law principles of bailment entitle it to warehouse commissions. It cites the general rule that, where a bailment is for the mutual benefit of bailor and bailee, the bailee is entitled to compensation, even without an explicit agreement to that effect. Ehret ignores, however, the fact that there was not a mutually beneficial bailment after the relationship between the parties ended in November, 1982. After that date, Ehret held Consolidated's bearings for its own benefit rather than for Consolidated's. John Ehret's telex of November 29, 1982, and letter of December 1, 1982, clearly stated that he was holding the bearings to insure that Consolidated would pay sales commissions owed to Ehret. Where a bailee retains the bailor's property to protect its own interests rather than those of the bailor, it cannot claim compensation from the bailor. *Weiland Tool & Mfg. Co. v. Whitney*, 44 Ill.2d 105, 118, 251 N.E.2d 242, 249 (1969).

## V. *Conclusion*

Accordingly, we affirm the district court's directed verdicts on counts 1 and 2 of Appellant Ehret–Krohn's counterclaim; we vacate the directed verdicts on counts 4 and 5, and remand those claims to the district court for trial.