MICHEL SUSAN FOSTER, Plaintiff-Appellee and Cross-Appellant, *v.* SPRINGFIELD CLINIC, Defendant-Appellant and Cross-Appellee.

Fourth District Nos. 15956, 15965 cons.

Opinion filed September 15, 1980.

J. Phillip O'Brien and Hugh J. Graham, III, both of Graham & Graham, of Springfield, for appellant.

Richard A. Hollis, of Springfield, for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

This case concerns a claim that an express one-year contract of employment continued in operation by implication for an additional year because, after the expiration of the first year, the employee continued for a short time to serve the employer as provided by the contract and the employer continued to accept the services.

On October 25, 1977, plaintiff, Michel Susan Foster, brought suit in the circuit court of Sangamon County seeking damages from defendant, Springfield Clinic (Clinic), a partnership, for breach of a contract by which she claimed she was employed as a physician by the Clinic. A jury awarded plaintiff $22,152.80. After hearing defendant's post-trial motion, that court entered an order on November 14, 1979, upholding the determination in favor of plaintiff but reducing the judgment to $15,806.66. Defendant appeals, and plaintiff cross-appeals contesting the reduction.

Defendant asserts (1) the evidence was insufficient to support a finding, inherent in the verdict, that the express one-year contract between the parties was renewed by implication for a subsequent year, (2) plaintiff was shown as a matter of law to have breached the express contract by failing to perform as required, and (3) the court erred in ruling on instructions concerning damages and possible condonation by defendant of any breach of contract by plaintiff.

The testimony in regard to plaintiff's employment can be divided into three periods: the precontract period, the written contract period, and the period subsequent to the expiration of the written contract.

During the precontract period, the plaintiff visited the Springfield Clinic and discussed employment terms with John Montgomery, the Clinic administrator. At this time, the plaintiff explained to Montgomery that, due to the nature of her practice, she might not generate as much money as some other doctors. Montgomery responded that a young physician was not necessarily expected to bring in enough income to cover her salary. No member of the Clinic told plaintiff how many hours she was expected to work or what she was expected to charge. Plaintiff was an internist with a subspecialty of endocrinology. Doctor Henry Rohs, also an internal medicine specialist with the Clinic, testified that he met with plaintiff before her employment and explained to her that because her subspecialty was not a major one, she would also have to care for patients with general medical problems.

The express contract was a written one for one year beginning August 1, 1976. It provided for a salary of $36,000 and fringe benefits. Plaintiff testified that she was informed by an official of the Clinic that it had a practice of considering associates for partnership at the beginning of the first fiscal year after the associate had completed one year of service at the Clinic. The Clinic's fiscal year began on March 1, so the first time plaintiff could have been considered for partnership under the practice would have been March 1, 1978. Plaintiff also testified that the Clinic official told her that the practice was that if the associate was not accepted for partnership, the associate would either leave then "by mutual agreement" or remain as an associate.

Plaintiff testified that while she had no obligation to see a particular number of patients, she understood that she should see a reasonable number. She said that she became aware of the Clinic's concern about her performance when Dr. Rohs met with her, at the direction of the Clinic's plan committee, in March 1977 and mentioned to her that her production was too low. She testified to then telling him that, in an effort to increase her production, she would resume giving general physical examinations. Dr. Rohs testified to telling her at that meeting that, while the Clinic did not necessarily expect her to generate income equal to her salary, they did expect a reasonable effort. He also stated that he told her the committee hoped her production would improve.

Judy Hulett, a Clinic receptionist, testified that after plaintiff had been employed for six to eight weeks she received word from plaintiff's office that plaintiff did not want any cold or headache cases and that plaintiff's nurse told her that plaintiff wished to limit her practice to diabetes cases and the giving of physical examinations. Hulett estimated from memory that from August 1976 to March 1977, plaintiff refused 70% of the cases referred to her. Plaintiff's nurse, Janet Helvey, testified that plaintiff's refusal of patients resulted from plaintiff's having no open time

for appointments or because the patients had problems plaintiff was not equipped to handle. Helvey stated that plaintiff never told her she wished to limit the scope of her practice or the number of patients she saw. In rebuttal, plaintiff admitted that on occasion she had told her nurse that she would not see patients with problems like a cold or flu, but had not otherwise tried to limit her practice except to refuse giving physical exams for a period of approximately three months. Plaintiff's patient volume varied from a high of seven patients per day to a low of three or four patients per day. Evidence was presented at trial that the national average of patient volume ranges from 12 to 40 patients seen per day.

Prior to the expiration of the one-year term of the express contract on July 31, 1977, no one from the Clinic contacted plaintiff for the purpose of negotiating a new contract nor did anyone tell her that she would not be permitted to remain. She continued to work at the Clinic beyond that date.

On August 3, 1977, plaintiff received a memorandum from John Montgomery, requesting her presence at the August 15, 1977, plan committee meeting. At the meeting, the committee asked plaintiff to provide reasons for her low productivity. The committee spoke in terms of money generated, gross charges per month, and patient number per month. Plaintiff provided the following reasons: weather which had caused appointment cancellations, new internists at the Clinic who created competition, new endocrinologists in the community, lack of patients coming into the Clinic, and a number of her patients who did not require follow-up visits. At that time, the plan committee recommended that she become involved with a medical school, give seminars and conferences, participate in student teaching, and take every patient possible from whatever source. Employment terms were not discussed at this meeting, nor was the plaintiff asked to take a reduction in salary.

Several days after the meeting, plaintiff received a memo from John Montgomery dated August 15, 1977, which stated that her salary for the coming year was to be reduced to $25,000. This reduction would become retroactively effective on August 1, 1977. Plaintiff sent Montgomery a letter stating that the offered salary was a breach of contract and that she would not accept anything less than $36,000. Soon after this exchange of letters, plaintiff met with Montgomery. He raised substantially the same questions which had been discussed at the August 15 meeting. He offered to help plaintiff, but gave no particulars as to how he would do so. Plaintiff stated that they never did reach an agreement in regard to salary.

On September 22, 1977, plaintiff received a letter from the chairman of the Clinic partnership which stated that her services would be terminated as of October 31, 1977.

Plaintiff claims that by accepting her services after July 31, 1977, defendant impliedly agreed to rehire her for an additional year upon the same conditions as the original contract. Her theory has long been recognized by Illinois courts.

> "It has been repeatedly held that where one party enters the employment of another under a special contract fixing the time and price to be paid, and continues in such employment after the term has elapsed, it will be presumed that the hiring and service were under the original contract." *Crane Bros. Manufacturing Co. v. Adams* (1892), 142 Ill. 125, 130, 30 N.E. 1030, 1032. Accord *Grover & Baker Sewing Machine Co. v. Bulkley* (1868), 48 Ill. 189; *Moline Plow Co. v. Booth* (1885), 17 Ill. App. 574. See also *Ingalls v. Allen* (1890), 132 Ill. 170, 23 N.E. 1026; *Chambers v. John T. Shayne & Co.* (1961), 32 Ill. App. 2d 16, 176 N.E.2d 645.

■■ Defendant has correctly pointed out that, in the bulk of Illinois cases, the employee continued his employment for a substantial period of time, *i.e.*, from 5.5 months to over one year. Admittedly, here the plaintiff worked for only three weeks before she was offered a different salary for the rest of the year. However, we conclude that (1) plaintiff's continued working for a three-week period coupled with (2) the evidence which could have led her to form an expectation of continued service at least as an associate, was a sufficient basis for the jury to find the employment contract to have been impliedly continued for an additional year.

Defendant maintains that the holding in *Davis v. Tampico Farmers Mutual Telephone Co.* (1947), 332 Ill. App. 200, 74 N.E.2d 721, negates the existence of an implied contract here. There a manager of a small corporation, who was also a member of its board of directors, had a yearly employment contract. He continued to work for one month and four days after its expiration and was then fired. He brought suit for the unpaid balance of an additional year's salary. The trial court, hearing the case at bench, found in plaintiff's favor but awarded him only an additional month's salary. The appellate court reversed, holding that as a matter of law the contract had not been impliedly continued for an additional period. The apparent reason for the decision was that at some time near the end of the year or more likely shortly thereafter, the plaintiff had been informed that the question of the renewal of the contract would be deferred by the defendant corporation pending negotiation and the plaintiff had agreed to continue temporarily. Thus, if before the end of the year this agreement had been made, or the plaintiff informed that a new contract must be negotiated, clearly no new contract for an additional period would have arisen. Had the agreement for the plaintiff to work on a temporary basis been made after the end of the

year, as was probably the case, it would have become a novation to any renewed contract that would have arisen by implication.

Here, the defendant's concern about plaintiff's low productivity was an insufficient indication that her job or her prior salary was threatened. The defendant had previously indicated to the plaintiff that she did not have to generate enough money to cover her salary and overhead. Even at the August 15 plan committee meeting, plaintiff was not informed that her salary was subject to change. Thus, the record does not support defendant's assertion that renewal of plaintiff's contract was in the process of negotiation. Furthermore, it is clear that she never agreed to continue working while negotiation continued. Rather, she always took the position that she was working under a continuation of the prior contract. *Davis* does not require that the instant jury verdict be set aside.

Defendant maintains that even if the contract had been renewed, it would only have been for a period until March 1, 1978, when plaintiff would have been considered for partnership. However, the sole evidence before the court is that plaintiff was informed that even if she was not offered a partnership at that time she would have the option of remaining if she wished. The context of her testimony on this point was that only her option of leaving was subject to "mutual agreement" of the parties.

■■ Defendant had the burden of proving that plaintiff had failed to perform her obligations under the contract and was discharged for cause. (*Brownholtz v. Providers Life Assurance Co.* (1928), 329 Ill. 42, 160 N.E. 127.) We do not find the jury's rejection of this affirmative defense to be contrary to the manifest weight of the evidence. There was a conflict in the evidence as to whether plaintiff refused to treat two particular patients referred to her. She had refused to treat patients suffering with colds or flu, but there was no showing that this was an absolute breach of her duty to her employer or their patients. No showing was made that these patients were forced to go without treatment. There was no showing that lack of productivity was considered by the Clinic to be a grounds for discharge. Defendant asserts that plaintiff's efforts did not comply with the following required standard:

> "All persons impliedly undertake,when they engage to do work, that they have a reasonable amount of skill in the employment, and that they will use it, and also engage for a reasonable amount of care, * * *." (*Parker v. Platt* (1874), 74 Ill. 430, 432.)

We deem the evidence sufficient for the jury to have found that plaintiff fulfilled this standard.

Defendant next claims that the trial court erred when it excluded evidence concerning volume of other physicians employed by the Springfield Clinic. Evidence is admissible of the general custom of others engaged in the same kind of business. (1 Gard, Illinois Evidence Manual

Rule 4:07 (2d ed. 1979).) The evidence in question was admissible but was cumulative to the testimony of John Montgomery and Dr. Conroy. Montgomery testified that internists average from 12 to 40 patients per day, while Conroy estimated the average to be 20 to 25. The importance of this testimony was mitigated somewhat by evidence that plaintiff was not expected to carry an average load. The exclusion of the evidence was not reversible error.

Defendant claims that plaintiff's instruction No. 26 concerning damages was improperly given because (1) it failed to correctly state the legal principle of set-off, and (2) it failed to incorporate defendant's alternate theory of contract duration.

■■ The defendant claims that the damage instruction failed to state that damages could be reduced not only by plaintiff's earnings subsequent to her discharge, but also by what she could have earned upon the exercise of reasonable diligence. A separate instruction on the exercise of reasonable diligence (defendant's instruction No. 42) was given to the jury. Defendant asserts that its instruction No. 42 was ineffective because it was overwhelmed by the specific monetary formulas in plaintiff's instruction. Having a single damages instruction listing all of the elements to be considered is highly desirable and the court should have required it here. However, the two instructions given taken together did state the law. Defendant's instruction No. 42 was not overwhelmed. We find no reversible error to have occurred.

As we have indicated, defendant's alternate theory that even if the contract was impliedly extended, the extension lasted only until March 1, 1978, was not supported by the evidence. Accordingly, the instruction concerning damages given at plaintiff's request properly made no provision for an award of damages based upon such a theory.

The following instructions concerning possible condonation by defendant of any contract breaches by plaintiff were given by the court at plaintiff's request and over defendant's objection:

"An employer who, after knowledge of material breach of contract on the part of its employee, continued to accept her services without reasonable cause for delay in discharging her, is presumed to have waived the breach of contract." Plaintiff's Instruction No. 10.

"A cause for discharging an employee may be condoned by the employer and thereby waived as the reason for discharging the employee. An employer who, after knowledge of a material breach of contract on the part of his employee, continued to accept her services without reasonable cause for delay in discharging her is presumed to have waived the breach, and will not be allowed to set it up afterward. The condonation, however, can in no respect

extend to subsequent or continued violation by the employee.

The legal cause for termination must exist on the day of discharge." Plaintiff's Instruction No. 22.

■■ Illinois precedent indicates that when single acts of improper conduct by an employee are known by an employer and the employer does not discharge the employee, the employer condones the misconduct. (*Butterick Publishing Co. v. Whitcomb* (1907), 225 Ill. 605, 80 N.E. 247; *Bartels v. Denler* (1975), 30 Ill. App. 3d 499, 333 N.E.2d 640; contra, *Alexis Stoneware Mfg. Co. v. Young* (1894), 59 Ill. App. 226.) On the other hand, if the misconduct continues until the time of discharge, no condonation takes place. (*Schaffer v. Park Bowl, Inc.* (1951), 345 Ill. App. 279, 102 N.E.2d 665.) Defendant maintains that the giving of the condonation instruction was error because the evidence showed plaintiff to have been failing to perform up to the time of her discharge. Defendant also points out that there was conflicting evidence of plaintiff's refusal to treat two particular patients which defendant might have condoned. It asserts that the instructions could have confused the jury into thinking that condonation of those acts of plaintiff would work a condonation of all of her claimed misconduct.

We disagree with defendant. Plaintiff's instruction No. 22 clearly states that continuing misconduct could not be condoned. Thus, if the jury found plaintiff to have been in breach of the contract by her general continuing practice of limiting the type of patients she saw, the instruction clearly told them that condonation of plaintiff's failure to treat the two particular patients would not be a condonation of her continuing conduct. On the other hand if the jury determined that her general conduct did not breach her contract but that she was in breach by failure to treat the two patients, the instructions properly informed the jurors that they could consider whether those breaches had been condoned.

The condonation instructions were proper.

On cross-appeal, plaintiff maintains that the trial court's reduction of the verdict by $6,346.14 (from $22,152.80 to $15,806.66) was error.

■■■ We agree with the trial court that under the evidence, the verdict was too high. Evidence showed that plaintiff had received from defendant, during a period from August 1, 1977, until October 31, 1977, its checks totaling $6,346.14, the amount of the reduction. This is the same sum that she would have received as salary for this period. Plaintiff claims that a check received in October was severance pay but it was in the same amount as checks received in other months and there is no evidence that it was paid as severance. The damages instruction contained a figure representing lost wages but did not take these payments into account. However, in cases where, as here, damages are unliquidated a trial court cannot properly reduce a damage award without the consent of the party

receiving the award. *Koltz v. Jahaaske* (1942), 312 Ill. App. 623, 38 N.E.2d 973.

Under Supreme Court Rule 366(a)(5) (73 Ill. 2d R. 366(a)(5)), we have authority on review to enter any order that ought to have been entered or to enter other further orders. Accordingly, we affirm the judgment of the trial court awarding plaintiff damages in the reduced sum of $15,806.66 on condition that within 30 days from the date of filing this opinion, plaintiff file a consent to the affirmance of said judgment with the clerk of the court. Upon the filing of such consent, the judgment will be affirmed. Otherwise the judgment will be reversed and the case remanded for a new trial.

TRAPP and WEBBER, JJ., concur.