JOSEPH V. LUKASIK, Plaintiff-Appellee and Cross-Appellant, *v.* RID-DELL, INC., Defendant-Appellant and Cross-Appellee.

First District (4th Division)   No. 82—1890

Opinion filed June 30, 1983.—Rehearing denied July 28, 1983.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Richard G. French and Dorothy F. French, of counsel), for appellee.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

While plaintiff was an employee of defendant, a shoe manufacturer, he entered into a written agreement that, to induce employee to remain in its services, defendant would upon plaintiff's retirement at 65 or thereafter, provide certain retirement benefits; these benefits were to be forfeited if plaintiff left voluntarily or involuntarily for disability or other reason or was discharged for proper cause. Thereafter before plaintiff's 65th birthday, he was fired by defendant after he failed to develop nine new shoe designs in about six months. He sued to recover the retirement benefits and lost wages. The trial court held that the contract was an employment contract, that the plaintiff was not discharged for good cause and therefore was entitled to recover the retirement benefits. However the trial court denied the claim for lost wages because plaintiff failed to mitigate damages. Both sides appealed. We find that the contract was not a contract for future employment; therefore, the trial court, albeit for the wrong reason, correctly ruled that plaintiff could not recover lost wages. However the trial court correctly awarded the retirement benefits provided by the

contract because the plaintiff did not forfeit those benefits when he was fired, since as the trial court found, the discharge was not for good cause. Accordingly, the judgment of the trial court is affirmed.

Plaintiff was first hired by defendant in 1936 when he (plaintiff) was 18 years old. First he worked in the stockroom. At that time the company was in the business of manufacturing athletic shoes. In 1938 he learned leather tanning. From 1940 to 1942 he was in charge of the entire shoe factory. In 1942 he left the company to go into military service. In the evenings, at Mrs. Riddell's request, he worked for defendant setting up production because it had no one to do that work. When plaintiff was released from service in 1945 he returned to defendant where he worked until 1975. In 1945 he was plant manager. His duties included scheduling production, looking over purchasing of raw material, checking quality and hiring and training people. Later he became an officer of the company. Although Everett Gordon, chairman of the board of Riddell, testified that even in 1966 plaintiff was unable to properly do his work, he was apparently so well thought of that in 1967 the company presented him an agreement to sign. This agreement, which was given to only three other officers of the company, provided retirement and death benefits. Its relevant provisions stated:

"WHEREAS, the services of Employee, his experience and knowledge of the affairs of Employer, are extremely valuable to Employer; and

WHEREAS, Employer desires that Employee continue and remain in its service and employ; and

WHEREAS, Employer has offered Employee retirement and death benefits as an incentive for him to remain in its service; and

WHEREAS, the parties hereto have agreed to certain terms and conditions in connection therewith and desire to reduce their agreement to writing,

NOW, THEREFORE, in consideration of the premises and other valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1. RETIREMENT BENEFITS.

(a) Employee may retire upon the first day of a month after his sixty-fifth birthday, or at such later date as may be mutually agreed upon by Employer and Employee.

(b) Upon said retirement Employer agrees to pay to Employee the total sum of One Hundred Thousand Dollars

($100,000.00), payable at the written option of Employee in not less than 120, nor more than 240, equal monthly installments, commencing upon the 10th day following the date of the Employee's retirement, and continuing on the 10th day of each and every month thereafter until Employee has received said total sum in full; subject, however, to the provisions of Paragraph 1 (c) hereof. Prior to the date of his retirement Employee shall designate in writing, on a form to be furnished by Employer, the number of months over which the said total sum shall be paid, and on said form Employee shall list the name(s) of his designee(s), pursuant to the option provided by Paragraph 3 hereof.

(c) In the event that Employee shall so retire, but shall die before receiving a sum equal to the total sum specified in Subparagraph 1(b) hereof, Employer agrees to continue to pay the said equal monthly installments to the person(s) designated in Paragraph 3 hereof, until the total sum of payments made to Employee and to said person(s) shall equal the sum of One Hundred Thousand Dollars ($100,000.00).

\* \* \*

### 4. DUTIES OF EMPLOYEE.

During the period while Employee remains in the active service of Employer, Employee shall faithfully perform his duties to the best of his ability and in accordance with the directions of Employer as given to Employee through the company's Board of Directors and the officers of Employer. Employee agrees to devote his best efforts to his services for Employer on a fulltime basis, subject to his right to receive reasonable vacations, agreed leave(s) of absence, and time off on account of temporary illness. Employee shall perform his duties in an efficient, trustworthy and businesslike manner and agrees not to become associated with, or engage in, or render service to, any other business.

### 5. NON-COMPETITION.

Employee agrees, during the period he is receiving retirement payments from Employer hereunder, not to become associated with, or engage in, or render services to, any other business which is competitive to the business of Employer.

\* \* \*

7. FORFEITURE.

·Should Employee fail to perform all of the terms and conditions of this Agreement to be performed by him, or should he voluntarily or involuntarily leave the employment of Employer (other than by agreed leave(s) of absence), whether by reason of disability or otherwise, prior to the time of his retirement, or if prior to such time he is discharged for proper cause by Employer, then all unpaid benefits provided herein shall be forfeited in their entirety, and neither Employee nor person(s) designated in Paragraph 3 hereof shall have any rights whatsoever thereto."

Everett Gordon and Gerald Morgan, president of the company in 1967, were present at the time the agreement was signed. Plaintiff was told that he had a future at the company and the agreement was to encourage his ability to work and have confidence in himself. The purpose of the agreement was to keep him with the company. Neither Morgan nor Gordon told him anything that differed from the terms of the agreement. No one told him the agreement guaranteed his employment or that he could not be fired.

Thereafter the company expanded; production increased and more people were hired. Conversely, in the seventies, plaintiff's duties were decreased and limited. Over a period of time he was relieved of his responsibilities for component parts, purchasing and quality control. By the early 1970's, plaintiff's responsibilities were limited to duties in shoe planning and design under the supervision of Richard Medley. Besides designing the shoe, he and Medley were responsible for preliminary "costing" of materials for shoes, for determining the sequence of routing of the shoe manufacture, together with the materials used in the shoes and for determining the tooling and machinery necessary for manufacture. Plaintiff also directed the model makers. In addition he presented the product to the dealers and salesmen. For the three or four years before he was terminated, plaintiff had no decision-making authority. Once plaintiff designed a shoe, that design would be submitted to a committee which would determine the feasibility of the design and the costs of production. A prototype would then be put through the plant on a pilot basis to measure what actually occurred. Plaintiff was not in charge of that. All the shoes defendant sold, except those in public domain, were designed by plaintiff.

Plaintiff testified that from 1967 to the time he was discharged there was no complaint about his work. No one ever informed him that he was not performing his work satisfactorily. Defendant admit-

ted that his work until 1976 was satisfactory and its witnesses testified that plaintiff was always a hard worker, one of the most loyal people who ever worked for defendant and always enthusiastic about his work.

On January 16, 1976, plaintiff was discharged. The personnel status change sheet he was given at that time stated that the reason was "reduction in work force."

Plaintiff testified that Everett Gordon informed him on January 16 that Wynn International which had purchased defendant, had decided to cut down on their budget and plaintiff was relieved of his duties. Everett said plaintiff had not done anything wrong; the discharge was primarily due to economic conditions. Plaintiff offered to take a cut in salary but was refused.

According to Everett Gordon and Frank Gordon, then president of defendant, in 1975 because of foreign competition the company determined to introduce nine new shoes in the fall, five in football and four in baseball. While it normally would take a year before a new shoe would be in a position to start selling in the fall, the commitment to design the nine new shoes was not made until January of 1975. Defendant needed samples of the shoes by August 1975. Enough of the product to show salesmen was necessary by September and full production by October 1975. There was no evidence as to when plaintiff was told of the plans but even assuming he was told in January he was expected to do nine times the usual work in much less than the usual time with no added personnel. Not surprisingly it was not done. In September defendant had handmade models. When Frank Gordon conferred with Medley all he got were promises. The new shoes were put on the market in the spring of 1976, several months after plaintiff was fired. As the shoes were manufactured, they were not up to the company's usual quality. While both Gordons testified as to the poor quality, there was no evidence directly connecting plaintiff with the quality failure, particularly since Medley, not plaintiff, supervised the work and, of course, plaintiff was no longer with the company when the work was completed. Furthermore, as Frank Gordon testified, before 1975 the company had been slow to put in new equipment and in 1976 it had to work with production tools which were inadequate. As Frank stated "*** with all the juryrigging that we did attempt, we never did make some of these products in the right." Likewise there was no evidence to indicate whether the plan to produce nine shoes in such a short time was feasible.

According to the Gordons both Medley and plaintiff were fired because of the shoe debacle.

I

■ The contract signed by the parties clearly and unambiguously promised the plaintiff certain retirement benefits unless he forfeited them. While, as stated by the contract, the promise was made in order to induce the plaintiff to continue in its employ, the contract also specifically provided that the only inducement made was the offering of retirement and death benefits:

"WHEREAS, Employer desires that Employee continue and remain in its service and employ; and

WHEREAS, Employer has offered Employee retirement and death benefits as an incentive for him to remain in its services."

Since the parties listed the benefits provided as the "inducements," those possible benefits not enumerated: namely, the guarantee of lifetime employment or employment until retirement must be presumed to be excluded. (*Suga v. Suga* (1962), 35 Ill. App. 2d 355, 182 N.E.2d 922; *Moore v. Southern Independent Oil & Refining Co.* (1945), 326 Ill. App. 112, 61 N.E.2d 684.) And plaintiff admitted at trial that when he signed the contract there was no representation the contract guaranteed his employment.

■■ ■ Furthermore, even if the contract could be construed to promise employment, there was no promise to employ plaintiff either for his lifetime or for a definite period of years. But where no specific duration of employment is agreed upon, generally either party may terminate at will. (*Mann v. Ben Tire Distributors, Ltd.* (1980), 89 Ill. App. 3d 695, 411 N.E.2d 1235; *Sargent v. Illinois Institute of Technology* (1979), 78 Ill. App. 3d 117, 397 N.E.2d 443, *appeal denied* (1980), 79 Ill. 2d 629.) Plaintiff's contention that the term is set by the provision that "Employee may retire upon the first day of a month after his sixty-fifth birthday ***" is without merit. First, this provision which is located in the provision of the contract pertaining to retirement benefits merely sets forth a condition on which such benefits may be received. Second, the provision does not say employee must retire when he is 65, so it does not purport to limit the period of employment. "May" does not mean "shall" and is not so construed in private contracts. (*Orr Construction Co. v. Department of Public Works & Buildings* (1975), 30 Ill. Ct. Cl. 266; *Northwestern Traveling Men's Association v. Crawford* (1906), 126 Ill. App. 468, *aff'd* (1907), 226 Ill. 57, 80 N.E. 736.) Accordingly plaintiff has not carried his burden of proving the existence of an agreement to employ him for a definite period. *Hernandez v. Trimarc Corp.* (1976), 38 Ill. App. 3d 1004, 350 N.E.2d 202, *appeal denied* (1976), 63 Ill. 2d

556; *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 327 N.E.2d 346.

## II

Although we believe the trial court erred in finding a contract of employment, this does not mean it erred in awarding plaintiff the retirement benefits. The benefits were promised in return for plaintiff's continuing to work for defendant; plaintiff did continue to work for defendant and so fulfilled his part of the bargain. While plaintiff did not work for defendant until he was 65, this was only because he was fired. A party cannot take advantage of a condition precedent which he has rendered impossible or complain of a failure to perform which he himself has prevented. *Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 419 N.E.2d 634; *Chicago Title & Trust Co. v. Hedges Manufacturing Co.* (1980), 91 Ill. App. 3d 173, 414 N.E.2d 232, *appeal denied* (1981), 83 Ill. 2d 569; *Ehard v. Pistakee Builders, Inc.* (1969), 111 Ill. App. 2d 227, 250 N.E.2d 1.

Defendant contends, however, that the plaintiff forfeited the benefits under paragraph 7 of the contract, arguing (1) that he was discharged for cause and (2) even if it was not for cause when he was fired he left involuntarily as set forth in the contract. The burden is on the employer to prove that the employee was guilty of conduct justifying his termination. (*Foster v. Springfield Clinic* (1980), 88 Ill. App. 3d 459, 410 N.E.2d 604; *Schaffer v. Park Bowl, Inc.* (1952), 345 Ill. App. 279, 102 N.E.2d 665; *Brownholtz v. Providers Life Assurance Co.* (1928), 329 Ill. 42, 160 N.E. 127.) It is for the trier of fact to determine whether the employee disobeyed reasonable orders and was discharged for good cause. (*Foster v. Springfield Clinic* (1980), 88 Ill. App. 3d 459, 410 N.E.2d 604; *Berriman v. Marvin* (1895), 59 Ill. App. 440, *aff'd* (1896), 162 Ill. 415, 44 N.E. 719.) Here the trial court could reasonably conclude that the defendant's order to complete nine times as much work in half the normal time was unreasonable. It could also conclude in light of the vagueness of the evidence, that there was no real proof as to who was at fault. There was, for example, no proof as to when plaintiff was instructed to design the new shoes (except that it could not have been before January), what instructions he was given or what role his supervisor played in the debacle. Furthermore, the court was entitled to disbelieve defendant's evidence and conclude that plaintiff was discharged solely as part of a reduction in the work force.

Defendant contends that the clause barring recovery if the plaintiff "should *** involuntarily leave the employment *** whether

by reason of disability or otherwise" also applies to bar recovery. Obviously the plaintiff did not leave by reason of disability. The question thus is whether the term "or otherwise" applies to a discharge not for good cause. Forfeitures are permitted only where the right to forfeiture is shown clearly and unequivocally and the language upon which an employer relies to claim a forfeiture of benefits must be strictly construed against the employer who wrote the contract and now is seeking the forfeiture. (*Parenti v. Wytmar & Co.* (1977), 49 Ill. App. 3d 860, 364 N.E.2d 909; and see *Allabastro v. Wheaton National Bank* (1979), 77 Ill. App. 3d 359, 395 N.E.2d 1212.) The words "or otherwise" must be construed to refer to events similar to disability. (*People v. Capuzi* (1960), 20 Ill. 2d 486, 170 N.E.2d 625.) Furthermore to construe this provision to apply to discharges even if not for good cause would render the phrase immediately following superfluous since that clause provides for forfeiture if the discharge is for good cause. Obviously there would be no need to prove the discharge was for good cause if the benefits were forfeited in any event. An agreement is to be construed to give meaning to all parts and the court must avoid a construction which renders some provisions superfluous. *Puszczewicz v. American Oil Co.* (1972), 6 Ill. App. 3d 1053, 286 N.E.2d 529 (abstract of opinion).

■ Accordingly while there was no contract guaranteeing plaintiff lifetime employment or employment until he was 65, the trial court did not err in awarding the plaintiff the retirement benefits provided for in the contract.

The judgment is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.