CECILIA CORPUZ, Plaintiff-Appellant, v. BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—92—3098

Opinion filed August 26, 1993.—Rehearing denied September 21, 1993.

Mark S. Simon, of Chicago (Jack Joseph, of counsel), for appellant.

Anthony E. Dombrow and Jeffrey Polisky, both of Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., of Chicago, for appellees.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Cecilia Corpuz, appeals from an order of the circuit court affirming the decision of the University of Illinois Civil Service Merit Board (Merit Board or Board) to dismiss her as business manager of the obstetrics and gynecology department of the University of Illinois (University). Corpuz alleges that the Merit Board's findings were against the manifest weight of the evidence; that in any case just cause for discharge did not exist; and that the Board's procedures violated her right to due process.

The investigation that led to Corpuz's discharge began in mid-1990 as a result of a communication received from the Vicks Research Center of the pharmaceutical company of Richardson-Vicks, Inc. An attorney for Vicks telephoned Dr. Bruce Bosmann, associate dean of research at the University of Illinois College of Medicine. The Vicks attorney informed Bosmann that Dr. Yusoff Dawood, formerly of the University's obstetrics and gynecology (OB-GYN) department, and Corpuz had been communicating with Vicks in an attempt to have Vicks release to Dr. Dawood funds related to a clinical drug study Dawood performed for Vicks while a member of the University's College of Medicine. The Vicks attorney asked Bosmann whether a letter received by Vicks dated April 13, 1990, was to be construed as a release to Dr. Dawood of funds owed to the University for the study. The letter to which the attorney referred was addressed to Vicks in care of Donna J. Patch, Manager, Medical/Clinical Studies, and stated specifically and in full:

"Re: 'Dysmenorrhea'
Dear Ms. Patch:
Our records indicate that the above study (#88-07) has been completed. All financial obligations to the University of Illinois had been met at the time of Dr. Dawood's departure from the Department of Obstetrics and Gynecology in December, 1989."

The letter was signed by Corpuz and cosigned by Bosmann as senior associate dean for research. A copy of the letter was forwarded to Dr. Dawood, the head of the OB/GYN department, and the grants and contracts office of the University's medical department.

In response to the Vicks attorney's inquiry, Bosmann informed Vicks that the letter was absolutely not intended as a release of funds

to Dawood, who had since left the University. Bosmann faxed a copy of the letter to the Vicks attorney with a handwritten note on its face which stated in pertinent part:

> "Please do not in any way interpret this as a release of obligations made between Vicks Richardson & the University of Illinois. Please make all checks payable to the Univ[ersity] of Illinois under any contract agreements we have with you."

Bosmann then met with Dr. Gerald Moss, dean of the College of Medicine, and an investigation of the OB-GYN department was initiated. The investigation conducted by the University office of audits revealed that over $360,000 of money considered to be owed to the University by various pharmaceutical companies for research studies performed by University doctors had been diverted to other recipients, for example, the University of Texas, Dr. Dawood's new employer. Five pharmaceutical companies were involved and in each case Corpuz issued a letter of completion similar to that noted above.

The auditor examiner also concluded that an OB-GYN staff fund account, a nonuniversity account for which Corpuz acted as treasurer, was being used as a repository for University funds. Out of these commingled funds, Corpuz, with the approval of her supervisor, had issued interest-free loans and salary advances to herself and other department members.

Finally, the investigation revealed that Corpuz had received added compensation at the direction of her supervisor in the amount of $1,500 a year for the years 1984 through 1990. This compensation was drawn from the staff fund account and was for services Corpuz rendered in connection with an evening lecture series sponsored by the OB/GYN department. Corpuz did not report this income to the "State of Illinois on her Statement of Economic Interests" disclosure form.

After the auditor's investigation, the University filed charges against Corpuz. A hearing was held before hearing officer August A. Grundei over five days in September and October of 1991. At the conclusion of the hearing, Grundei made the following specific findings of fact addressed to the secretary of the University Merit Board:

> "CECILIA CORPUZ was a competent, efficient and trusted employee of over 18 years, earning $50,000.00 per year as business manager of the department for ten years. Her fellow employees courageously came forward and supported her. Her employment record with the University is without blemish until this incident. The staff account was being misused when she came into the department. She never received any notice about

this staff account concerning her conduct for misfeasance or nonfeasance for the ten year period. No one, other than the prosecutor and the investigators herein (post-factum), understands this staff account and its limits. No one, other than the prosecutor and the investigators herein (post-factum), understands the policy of the University as applied to this staff account. All monies paid in and out of the staff account were under the direction and authorization of the supervising doctor.

Cecelia Corpuz received a relatively small benefit when compared to the major benefit received by others from this staff account. The payment of the $1,500.00 bonus per year for an exempt salary employee was directed by her supervisor and accepted by her. The making of loans and the payment of advances were directed and authorized by her supervisor.

In theory, Cecilia Corpuz should have known the limits of the staff account based upon her job description, but in reality the problem is that no one knows the limits of this staff account. This is the dichotomy of theory and fact.

The written charges for discharge were clear and comprehensible by petitioner's attorney. The University substantially cooperated with petitioner's attorney in good faith.

This system of external drug company funding, as related to the staff account, herein, and Cecilia Corpuz's knowledge therein is as follows:

I That Cecilia Corpuz did not know and could not know the policy concerning the staff account.

II That Cecilia Corpuz did not know and could not know the limits of the staff account.

III That Cecilia Corpuz is not responsible for the ordering and correcting of this system of external drug company funding."

The University's Merit Board concluded that the charges against Corpuz were sustained, and on January 14, 1993, the Merit Board discharged Corpuz based on the following causes:

1. Improperly issuing letters of completion to granting agencies which allowed monies owed the University to be diverted to other institutions or persons.

2. Failure to properly account for and monitor research and gift funds.

3. Violating the grants contracts and gifts provisions of the "General Rules Concerning University Organization and Procedure" with reference to your administration of the staff fund.

4. Improperly accepting $1,500 added compensation each year from 1984 to 1990 in violation of "Policy and Rules Nonacademic" and failure to report the added income to the State as required by law.

Corpuz appealed the Board's decision to the circuit court, where it was affirmed. She now brings this appeal. Corpuz's first argument on appeal is that the Merit Board's conclusion that she improperly issued letters of completion to the pharmaceutical companies resulting in the improper diversion of funds to other institutions or persons is against the manifest weight of the evidence. The letters of completion on their face cannot be construed as releasing funds to other institutions that were owed to the University. The letters cannot therefore be considered a "cause in fact" of the improper diversions. *Thacker v. U N R Industries, Inc.* (1992), 151 Ill. 2d 343, 354, 603 N.E.2d 449.

Corpuz contends that the letters of completion merely state that the grant studies were completed and that any related expenses were covered or accounted for. Corpuz testified before the hearing officer that before issuing the letters of completion she checked under the particular grant contract account number to assure the accuracy of her letter. Under the plaintiff's argument, the actual diversion of funds occurred because of instructions issued to the pharmaceutical companies by the particular doctors, also known as principal investigators, involved in the grant study. As an example, Corpuz offers a letter to Hoechst-Roussel Pharmaceuticals, Inc., from Dr. Dawood from which the following is excerpted:

"I will be taking up my new appointment *** at the University of Texas Medical School ***. The studies *** conducted by me have been completed. All expenses for the study have been defrayed from my other research accounts and enclosed is a statement attesting to that.

Therefore I am requesting that the balance of the grant due for the studies conducted by me be made out to my new institution ***."

Corpuz stipulated before the hearing examiner that in one case she knew that, as a result of her letter of release, over $66,000 in funds owed to the University would be diverted to the University of Louisville. Corpuz's understanding of the destination of the funds came through a letter forwarded to her from Fuller Lyons of the University's grants and contracts office. The letter was addressed to Lyons from Pfizer Pharmaceutical. In the letter, a Pfizer representative notes that the letter is a confirmation of a previous conversation with Lyons from which the representative understood there would be no

problem in obtaining a release of the University of Illinois as payee in order that payment could be made to the University of Louisville in the name of Dr. Gall, formerly of the University of Illinois. The Pfizer letter was forwarded to Corpuz, who directed a letter to Pfizer stating that the study had been completed and all financial obligations to the University of Illinois had been met at the time of Dr. Gall's departure. The letter was cosigned by Bosmann. Corpuz asserts that she issued the letter of completion only after receiving authorization from Dr. Bosmann, whom, she argues, she fully informed of the circumstances.

In response to Corpuz's argument, the University argues, based on Bosmann's testimony, that Bosmann was unaware when he cosigned the letter of release to Pfizer Pharmaceutical that the designated funds were being diverted to the University of Louisville. The University asserts that since the Pfizer letter was similar in language to the other letters, Corpuz knew that the other letters would also result in a diversion of grant funds. According to the University, Corpuz's issuance of the letters was gross negligence, flagrant incompetence, or grossly inadequate job performance in that she knew or should have known that in issuing the letters substantial amounts of monies would be diverted from the University.

Furthermore, it is the University's contention that Corpuz had a responsibility to ensure not only that grant monies were not diverted but also to actively collect grant money owed to the University for completed studies. The University relies on the testimony of University officials and reference to Corpuz's job description in asserting that by virtue of her position in the department, Corpuz's superiors relied on her to assure that the OB-GYN department's business and financial procedures comported with University policy.

With specific reference to grant management, Corpuz's job description charges her with the following:

> "Serves as primary financial advisor to Principal Investigators in the development and submission of all new and renewal grant applications to ensure that all non-technical aspects have been correctly and adequately represented.
>
> Prepares detailed financial portions of proposals defining salary and other expenditure requirements in accordance with granting agencies specifications, as well as University guidelines and procedures.
>
> Maintains surveillance over all grant accounts and provides Principal Investigator with monthly and quarterly financial reports. Develops and reports operational statistical data as spe-

cifically desired by the Head of the Department or as required by supporting organization.

Makes appropriate recommendations when budget revisions and transfers are required to support grant operations."

■ We do not believe that the manifest weight of the evidence supports a finding that the plaintiff, Corpuz, improperly issued letters which allowed monies owed to the University to be diverted to other institutions. The University has not provided competent evidence that the pharmaceutical companies released funds to alternate recipients in reliance on the letters in themselves. To the contrary, the record indicates that it was the request of doctors or principal investigators that, in conjunction with the letters of completion, prompted the drug companies to forward funds to other institutions. Dr. Moss, the dean of the College of Medicine, while laying responsibility for the diversion of the funds on Corpuz, acknowledged in his testimony that the pharmaceutical companies based their decisions on communiques from the responsible doctors.

Further, we believe it is contrary to the manifest weight of the evidence to assume that it was Corpuz's affirmative duty to collect the grant funds owed to the University under contracts the drug companies entered into with the members of the OB-GYN staff. While Dr. Moss and other officials of the University were of this opinion, it is not an assertion supported by reference to Corpuz's job description.

Moreover, there was testimony from Fuller Lyons, the associate director of the grants and contracts department of the University, that under most circumstances it was his department's function to oversee the funding of research grants. Lyons' assertion is supported by a 1977 University written policy statement that is included in the record. The policy statement states that among other duties, the grants and contracts office is responsible for setting up the contract accounts and submitting billings to sponsors. Lyons also testified that in his view, with respect to individual medical departments, it is the principal investigator of the research study who is the primary department member obligated to ensure that money from grants in which he or she is involved is correctly funneled to the University. James Moran, assistant director of University audits, testified that the grants and contracts office was the primary body charged with collecting grant funds. In his view, Corpuz and the primary investigator were also responsible. Corpuz testified that it was her understanding that the grants and contracts office performed the duty of collecting grant funds.

There is also testimony in the record that in some instances the doctors entered into informal agreements with the pharmaceutical companies to conduct research or extend research projects. These agreements were not formalized through the grants and contracts office and it is unclear who was to be responsible for overseeing these agreements. Furthermore, it appears that until the issue arose with respect to the plaintiff, the University was not particularly concerned with the whereabouts of excess grant monies. Lyons testified that while he believed everyone connected with the University should have its best interests in mind, he was not officially concerned about the grant accounts unless they were in deficit. The auditor testified that he was under the impression that problems in the way the grants and contracts for drug studies were being administered also existed in departments other than OB-GYN. Dr. Bosmann testified that money left over from a grant study should go into the University's general account. He admitted that in the five years he had been with the University, he was aware of fewer than 10 times in which excess grant money was deposited to the general account. Bosmann testified that at any given time the University is involved in about 400 active grants for a total of $45 million in sponsored research. Finally, Dean Moss admitted that under his authority Dr. Bosmann had authorized $200,000 in equipment purchased in connection with a grant transferred to Dr. Dawood at his new institution, the University of Texas.

We recognize that in one case Corpuz admitted that she knew a diversion of grant funds would occur after she forwarded a letter of completion. We also recognize that our standard of review in this case is a high one in which we must assume that the Merit Board's findings and conclusions of fact are *prima facie* correct. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110; *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 426 N.E.2d 885.) Nevertheless, after examining the evidence of record as noted in our discussion above, we believe that the Merit Board's finding that in generating letters of completion Corpuz allowed monies owed the University to be diverted to other institutions or persons is against the manifest weight of the evidence. The letters on their face cannot be construed as directing the pharmaceutical companies to forward grant monies to other institutions. Further, it does not appear from Corpuz's job description, or the policy of the University as written or practiced, that collecting or ensuring the collection of grant monies was a part of Corpuz's responsibility.

The second and third Merit Board charges against Corpuz stem from her duties with respect to the administration of the OB-

GYN staff fund. As a result of the audit investigation of the OB-GYN department, the University auditors concluded that during the period 1980 through 1989 research-related monies were improperly deposited into the staff fund as opposed to a University grant, contract or gift account. The auditors also concluded that improper loans and salary advances were made to members of the OB-GYN department out of the staff fund. In some instances, the loans were as much as $10,000 at a time to one individual. These loans and advances also included $6,000 directed to the plaintiff, Corpuz.

The staff fund is a fund operating under the umbrella of a larger fund known as the Chicago Organizations Fund (Chicago Fund). The Chicago Organizations Fund has a procedure manual in which it is specified that the Chicago Fund is an entity that functions separately from the University. The Chicago Organizations Fund encompasses all the funds of its member organization, be they University of Illinois fraternities, clubs, or various University of Illinois departments. The accounts are funded with money generated by the particular organization. In the case of the OB-GYN department, the self-generated funds came from a Friday night lecture series that the department sponsored. The Chicago Fund maintains the books and accounts for the particular member organization and issues the checks drawn on the accounts based on vouchers presented by the organization. Deposits to organization accounts are made through the University's office of business affairs and posted by the Chicago Fund to the appropriate organization's ledger. The Chicago Fund monitors the individual member accounts to oversee their financial soundness.

The director of the Chicago Fund, Wayne Wolf, testified that he did not see any impropriety in loans to employees coming out of the staff fund; however, he noted that it was inappropriate to deposit funds into a staff account that were directed to the University. Wolf testified that the Chicago Fund does not generally review the individual transactions of its member groups but it makes periodic reviews of the accounts. Wolf testified that a member fund may typically contain $10,000 to $12,000; however, if the balance increases beyond this amount, his concern over the propriety of the account increases proportionately.

Wolf testified that he remembered making several inquiries to Corpuz in 1987 about a $125,000 balance in the OB-GYN staff account as he suspected that a large amount of the balance was attributable to University funds. After Wolf consulted with Corpuz, she cooperated in transferring the money out of the staff fund into University grant accounts. Thereafter, the balance in the staff account again rose to an

inappropriate level. Lyons of the contracts and grants department confirmed that grant money was transferred out of the OB-GYN staff account into grant accounts.

Corpuz does not deny that she deposited grant funds into the staff account or that she made salary advances and loans to members of the OB-GYN department from the staff account. Corpuz testified that before depositing grant money into the staff fund she checked to determine whether the University had an account for the particular grant. If it did not, she deposited the funds into the staff account. Corpuz argues that she maintained the staff fund in accordance with the instructions of Dr. Spellacy, the OB-GYN department head under whom she worked from the beginning of her tenure in OB-GYN until he departed in June of 1988. Corpuz admitted that as of 1983, she understood that the staff account was a private fund; however, she did not think to tell Dr. Spellacy.

Dr. Spellacy testified through deposition that Corpuz never exceeded the authority he allowed her with respect to the staff fund. Spellacy admitted that grant funds were deposited into the staff fund. Spellacy assumed the staff account was just another University account and he "presume[d]" that the University auditors would inform the department if it was managing the staff fund incorrectly. Spellacy also testified that he relied on Corpuz and the University's business office to handle the procedures related to grants and contracts.

Corpuz argues that she had no way of knowing the limitations of the staff account. Although the procedures manual for the Chicago Fund specifies that it is a separate entity from the University, it does not set out restrictions on the source of funding or restrictions on expenditures. The University's "Business and Financial Policies, Guidelines and Procedures Manual" makes no reference to the Chicago Fund or the staff account.

Further, Corpuz maintains that in making deposits and withdrawals to and from the staff account, she always comported with the proper procedures of documentation. Corpuz argues that the University was aware of the character of the OB-GYN staff fund as withdrawal requisitions were made through the director of accounting and deposits to the staff fund of checks that were made out to "University of Illinois" were funneled through the University business office. Other than the inquiries she received from the director of accounting in 1987, no administrator ever informed Corpuz that she was misusing the staff account.

For these reasons, Corpuz argues that the University waived its adherence to any policies related to the staff account and in effect

condoned her practices. In support of her argument, Corpuz cites to *Whalen v. K mart Corp.* (1988), 166 Ill. App. 3d 339, 519 N.E.2d 991, and *Foster v. Springfield Clinic* (1980), 88 Ill. App. 3d 459, 410 N.E.2d 604.

Under the circumstances of the present case, we do not believe that the University has condoned the plaintiff's activities and waived its right to charge her. Further, we believe that the Merit Board's finding that the plaintiff mismanaged the staff account by improperly depositing into it University funds and making staff loans and salary advances out of those funds is not against the manifest weight of the evidence. Part of Corpuz's job description charges her with, among other duties, assuming the responsibility for the correct use of resources; assuring that department operations conform with University policies; and advising the department head on the status, allocation, and use of accounts and funds. Additionally, according to the job description, Corpuz's position is considered to be one requiring independent judgment, a high level of responsibility and a low level of supervision. We do agree with the hearing officer that the staff account was apparently being misused before Corpuz came to work in OB-GYN. It is also apparent that there were not at the time clear guidelines defining the function of the staff fund. That others in the University were apparently aware that the account was being mishandled is further proof that the University was either unconcerned or unclear as to the limitations of the fund.

Nevertheless, the University does have written policies specifically stating that "No department or unit shall receive any monies directly unless authorized by *** Business and Finance. *** All monies shall be accounted for and paid over in such manner as *** Business and Finance shall direct." Further, the policies provide that new accounts for projects can be opened by submitting a request to the office of grants and contracts. It is undisputed that money generated from grant studies is the property of the University and therefore falls under the general policy guidelines of the University. It follows that grant money was improperly deposited into the OB-GYN staff account and that knowledge of this impropriety could have been ascertained with reference to the University's written policy manual.

As for the loans and salary advances from the staff fund, it becomes apparent from the total amount of these loans and advances that they were necessarily funded at least in part by the improper deposits from grant monies. The loans were therefore out of University funds, and Corpuz admitted that she informed Spellacy at one time that the OB-GYN department was not authorized to grant such loans.

We recognize that in overriding her concerns, Spellacy put Corpuz in an unfortunate position of conflict. Nevertheless, we do not believe it was against the manifest weight of the evidence for the Merit Board to find that it was among Corpuz's duties to ascertain the proper use of the staff fund and impress upon her department head the improprieties in the department's practice.

■ The Merit Board's final charge was that the plaintiff improperly accepted $1,500 per year in added compensation each year from 1984 to 1990 in violation of University policy and failed to report the added income as required by State law. The University asserts that any additional compensation for Corpuz was required to be routed through the director of personnel services as stipulated in the University policy entitled "Additional Compensation for Special Work Assignments Nonacademic Employees." Under the policy, when a nonacademic employee performs work of limited duration on special assignment outside of the employee's home department and outside the employee's regularly scheduled work hours, requests for additional compensation must be preapproved by the University director of personnel.

Furthermore, the University asserts that Corpuz was required to report this income as required by the Illinois Governmental Ethics Act (Ethics Act). (Ill. Rev. Stat. 1991, ch. 127, par. 604A—101 *et seq.*) Under the Ethics Act, earnings from professional services in which a State employee acts as an officer, director, associate, partner or proprietor or advisor in any capacity must be reported if the income so derived is in excess of $1,200 per year. (Ill. Rev. Stat. 1991, ch. 127, par. 604A—102(a)(1).) The Act also requires anyone rendering professional services other than to the unit of government for whom the person is an employee to report income for the professional services if it exceeds $5,000 per year.

Corpuz's response to the University's argument is that her added remuneration was for attending and coordinating the first Friday night lecture series of the OB-GYN department. She asserts that this responsibility was not part of her job description and that it required her to work in the evening, resulting in additional personal expense such as cab fare and baby-sitting fees. In response to the circumstances, Corpuz's department head, Dr. Spellacy, authorized the additional compensation to be drawn from the staff fund for which the Friday night series was a source of income. Additionally, Corpuz asserts that with respect to the Ethics Act, she was subject to the higher threshold requirement of $5,000 for professional services rendered to other than her employer.

We believe there is an inherent flaw in the University asserting on the one hand that any additional compensation Corpuz received for the Friday night series should have been processed through the University's employee office and on the other hand that Corpuz was required to report the income under the Ethics Act, which essentially monitors an employee's outside activities as they may relate to her public employment. (See *Stein v. Howlett* (1972), 52 Ill. 2d 570, 289 N.E.2d 409, *appeal dismissed* (1973), 412 U.S. 925, 37 L. Ed. 2d 152, 93 S. Ct. 2750.) We do not believe that a finding of one or the other is against the manifest weight of the evidence; however, we also do not believe that the charges may stand together.

We believe that the Merit Board's first finding that Corpuz's letters of completion to the pharmaceutical companies resulted in monies being improperly diverted from the University is not supported by substantial evidence in the record and is contrary to the manifest weight of the evidence. Furthermore, we believe that the University's final charges that Corpuz improperly received additional compensation and failed to report it are in conflict. For these reasons we remand this case for further consideration as to whether there exists just cause for Corpuz's discharge from the University. The Illinois courts have defined cause "as some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public policy recognize as good cause for his no longer holding the position." *Fox v. Illinois Civil Service Comm'n* (1978), 66 Ill. App. 3d 381, 388-89, 383 N.E.2d 1201, 1206.

■■ Corpuz's final argument on appeal is that because she was not given the opportunity to testify on her own behalf and did not receive reasonable and adequate notice of the charges against her, the Merit Board denied plaintiff's right to due process. The plaintiff also asserts a violation of her rights in that she was not given the opportunity to depose the University's senior auditor, James Moran, before he was called to testify before the hearing officer.

The University asserts that Corpuz has waived her due process claim. The University argues that when the Merit Board gave her an opportunity to make objections to the record of the proceeding before the hearing officer, instead of raising objections to the Merit Board, Corpuz objected that the record was deficient in that it failed to include certain rulings and motions. Corpuz particularized these deficiencies in her response to the Merit Board.

We do not believe Corpuz has waived her right to appeal her due process claim. Although an argument raised for the first time on judi-

cial review may serve to waive the argument, we believe that the defendant's attempt to so categorize the plaintiff's action in this case is without substance. The plaintiff's objections were effectively raised prior to judicial review when she asserted and specified deficiencies in the record of the hearing to the Merit Board. See *Lebajo v. Department of Public Aid* (1991), 210 Ill. App. 3d 263, 569 N.E.2d 70.

However, we also do not believe that Corpuz suffered a deprivation of due process rights. In an administrative proceeding involving the discharge of a public employee, the employee's due process rights are met if the employee is given notice of the charges against her, an explanation of the employer's evidence, and an opportunity to be heard. (*Phillips v. Civil Service Comm'n* (1988), 172 Ill. App. 3d 278, 526 N.E.2d 549.) Some kind of hearing is required; however, the proceedings may be informal. The opportunity to be heard need only be extensive enough to guard against a mistaken decision. *Phillips v. Civil Service Comm'n*, 172 Ill. App. 3d 278, 526 N.E.2d 549.

In the present case, the plaintiff received formal written notice of the charges against her. The charges were itemized and explained with reference to specific dates and amounts. The University also provided the plaintiff with University documents and records supporting the charges. The hearing officer concluded that "the written charges for discharge were clear and comprehensible by petitioner's attorney." Furthermore, although the plaintiff did not testify as part of her direct defense, she was given the opportunity to be heard when she offered extensive testimony as an adverse witness of the University. The plaintiff was also provided ample opportunity at the hearing to cross-examine the University auditor, Moran. The hearing proceeded over five days and included numerous witnesses, including those of the plaintiff. The hearing officer received into evidence numerous exhibits. Under these circumstances, we do not believe further procedural protections were necessary. (See *Balmoral Racing Club, Inc. v. Illinois Racing Board* (1992), 151 Ill. 2d 367, 603 N.E.2d 489 (due process calls for such procedural protections as a particular situation demands).) The ruling of the trial court with respect to the issue of due process is therefore affirmed.

Affirmed in part; reversed in part and remanded for a determination of whether just cause exists for the discharge of the plaintiff.

JOHNSON and HOFFMAN, JJ., concur.