In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3689

Fred J. Hart,

Plaintiff-Appellant,

v.

Schering-Plough Corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 0814--David H. Coar, Judge.

Argued April 2, 2001--Decided June 7, 2001

Before Bauer, Cudahy, and Easterbrook,
Circuit Judges.

Easterbrook, Circuit Judge. Alarm bells went off when we read the jurisdictional statement of Fred Hart's brief: "Amount in controversy: $72,436.62 plus Plaintiff's attorney's fees, to be assessed by the court, should plaintiff prevail, pursuant to 705 ILCS sec.225/1." Oops. "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs" and the parties are of diverse citizenship. 28 U.S.C. sec.1332(a). The Illinois statute on which Hart relies defines attorneys' fees as part of costs, making it hard to see how this case belongs in federal court, for diversity of citizenship is its only jurisdictional foundation.

Schering-Plough Corp., the defendant, recognized that something is amiss. The jurisdictional statement in its brief asserts: "The amount in controversy is $90,000 plus attorney fees." Why the difference? Hart contends that he is entitled to one year's pay as a severance benefit, and according to the complaint his annual salary at the time of his discharge was $90,000. But this does not mean that the amount in controversy is $90,000, because Schering-Plough made a severance payment of $17,463.38 when it

let Hart go. The amount in controversy is whatever is required to satisfy the plaintiff's demand, in full, on the date suit begins. See Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955, 958-59 (7th Cir. 1998). The controverted amount--the stake of this case--is Hart's annual salary, less what Schering-Plough already has paid. So Hart was right to deduct the severance payment, and the jurisdictional problem remains. (If the severance payment were due under a welfare-benefit plan, then the claim would arise under federal law and the amount in controversy would not matter. But the claim rests on a contract negotiated in Australia; neither side contends that this contract creates a plan covered by ERISA.)

At oral argument we directed the parties to file supplemental memoranda on subject-matter jurisdiction. Schering-Plough's response relies on the attorneys' fees authorized by 705 ILCS sec.225/1 in the event an employee obtains fringe benefits though litigation. Although that statute defines fees as part of costs, and sec.1332(a) says that the amount in controversy must exceed $75,000 "exclusive of interest and costs", we know from Missouri State Life Insurance Co. v. Jones, 290 U.S. 199 (1933), that the division between "damages" and "costs" in sec.1332 depends on federal law. It is therefore possible in principle for attorneys' fees under 705 ILCS sec.225/1 to count toward the amount in controversy, just as Jones held that attorneys' fees under the state law in question were treated as part of damages. If, for example, Hart had incurred fees pursuing his demand before filing suit, and if these were compensable under 705 ILCS sec.225/1, they might propel the amount in controversy over $75,000. See Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1078 (7th Cir. 1986); Ross v. Inter-Ocean Insurance Co., 693 F.2d 659 (7th Cir. 1982). But neither Hart nor Schering-Plough relies on this possibility. Instead Schering-Plough contends that legal expenses incurred after filing count toward the amount in controversy. That submission can't be reconciled with Gardynski-Leschuck or the proposition that jurisdiction depends on events that exist on or before the date of filing. If the defendant can extinguish the plaintiff's entire claim

by tendering $75,000 or less at the outset, then the amount "in controversy" does not exceed $75,000. (To the extent Sarnoff, Ross, and Batts Restaurant, Inc. v. Commercial Insurance Co. of Newark, 406 F.2d 118 (7th Cir. 1969), imply that attorneys' fees incurred during the federal litigation count toward the jurisdictional minimum, they have been superseded by Gardynski-Leschuck. None of the earlier opinions dealt with the question how fees yet to be incurred could be "in controversy" on the date the complaint is filed, and none can be deemed a holding on a point that was assumed but not decided. Gardynski-Leschuck squarely addresses that question and represents this circuit's resolution of it.)

As it happens, however, Hart's salary was more than $90,000 per year. Hart's jurisdictional memorandum states that "[d]uring discovery, it developed that . . . [Hart's] annual salary, at the time of his termination, was in fact $99,972.80". Actually it was higher still. The document to which Hart's memorandum referred us shows that his salary for 1996 was $109,472.80, of which $9,500 was contributed to a retirement plan but must be included in the base for purposes of severance pay. Surely Hart did not need discovery to learn his own salary. Much pain could have been avoided had Hart's complaint correctly identified the stakes. But the fact remains that the amount in controversy on the date of fil ing was $91,910.42 ($109,472.80 $17,562.38). Even on appeal the parties may amend their pleadings under 28 U.S.C. sec.1653 to show the true jurisdictional facts when the litigation began. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 831 (1989). Hart's jurisdictional memorandum implies a motion to amend the pleadings under sec.1653, and we grant that motion. Jurisdiction is secure.

Pitman-Moore employed Hart as a scientist in Australia, his native land. Knowing that his position was about to be reorganized out of existence, Hart agreed to accept a transfer to Pitman-Moore's facilities in the United States. He signed a contract, which the parties called a "Foreign Assignment Agreement", providing for 12 months' employment, plus an option to extend this period for an extra six months. Pitman-Moore promised

to add substantial housing benefits, an automobile allowance, and a cost-of-living allowance to Hart's annual salary of $54,000. The agreement wraps up with this termination clause:

Should your employment be involuntarily terminated by Pitman-Moore, Inc., other than for cause as defined in the Policy Manual, or there is no assignment available in Australia at the end of your twelve (12) month assignment, the Company will provide you with a severance payment of one (1) year's salary in effect at the time of termination.

Hart moved to the United States in January 1994 and went to work at Pitman-Moore's facility in Mundelein, Illinois. At the end of that year Pitman-Moore (which renamed itself Mallinckrodt Veterinary, Inc., in March 1994) exercised its option to extend the agreement for six months. In July 1995 Hart could have taken advantage of the termination clause and demanded a transfer home or severance pay if no position then was available in Australia. Instead he agreed to stay on at Mallinckrodt, which substantially increased his base salary but withdrew the allowances and other benefits required by the Foreign Assignment Agreement. Mallinckrodt also sponsored Hart for permanent residence under U.S. immigration laws. That status, once granted, allowed Hart to take any job available in the U.S. (a privilege he did not possess under the visa obtained to carry out the Foreign Assignment Agreement). Schering-Plough acquired Mallinckrodt in July 1997 and promptly told Hart that his services were no longer required. It paid Hart a severance benefit appropriate under its own policies; Hart replied with this suit demanding the rest of one year's salary under the Foreign Assignment Agreement-- though Hart did not return to Australia, using his permanent-residence status to take a new position in Connecticut. After a bench trial, the district judge found that the termination provision of that Agreement expired in July 1995 and entered judgment for Schering-Plough. 2000 U.S. Dist. Lexis 13879 (N.D. Ill. Sept. 18, 2000).

 For reasons that are not entirely clear,

the parties have agreed that Illinois law rather than Australian law governs the interpretation of the Foreign Assignment Agreement. But it is hard to see how choice of law could matter, or for that matter why a trial was necessary. Both the Agreement and its termination clause are clear: the assignment lasts for 18 months at most. Work after the end of June 1995 was governed by new terms. The Agreement had lapsed, and Hart forewent his opportunity to return home (or be paid in lieu of reemployment). What the trial added is confirmation that the parties behaved in accordance with this straightforward reading of the Foreign Assignment Agreement and did not extend its duration by conduct. See Foster v. Springfield Clinic, 88 Ill. App. 3d 459, 410 N.E.2d 604 (4th Dist. 1980). When the Agreement ran out, they forged a new arrangement: the fringe benefits specified by the Agreement vanished, the base salary rose, and Hart's visa status changed. He became a permanent resident, no longer exposed to the risks attendant on visas linked to particular jobs and therefore no longer in need of special protection should that job come to an end. The district judge found that the parties' conduct in mid-1995, and later, confirmed the natural-language reading of the Agreement and its termination clause. No extrinsic ambiguity turned up. Hart stresses that the Agreement was to last for the period of the "assignment," but the Agreement also shows (and the parties' conduct confirms) that the "assignment" was to run a maximum of 18 months; the word "assignment" in this contract was not a synonym for "employment." None of the district court's findings or conclusions is clearly erroneous.

Affirmed